GEORGE OLEAR, MURON BISHKO, SYLVESTER WARYCHA, PETER KOPSKY, ANDREW REPES, FRANK LILWAK, HOOD RYDZIK, ANDRES FASSER, PETRO BUGEL, JOHN SMERK, PETE SERNIAK, WASYL GALAYDA, STEVE KURYLA, MICHAEL DEMIANCHYK, TOM MAKARA, MAX GOTCH, AMELIA KOPSKY, JULIA BISHKO, PETE MOTYKA, MARY WARYCHA, PAUL SUDA AND THOMAS JEBCHANKA, Respondents, v. REV. JOSEPH HANIAK, MICHAEL DMYTRYSZYN, WILLIAM BILYK, HARRY KRYSSA, DR. NICHOLAS KLIM AND FRANK CHURA, Appellants.—131 S. W. (2d) 375.

St. Louis Court of Appeals.   Opinion filed July 11, 1939.

Motion for rehearing denied Sept. 8, 1939.

250

*John C. Vogel* and *A. P. Kaufmann* for respondents.

*Paul Dillon* for appellants.

SUTTON, C.—This is an injunction suit.

The St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis, Missouri, was organized in the year 1900 as a voluntary religious society of the Catholic Faith. The church property is located at Dolman and Hickory Streets, in the City of St. Louis, and was purchased by the society in 1910. Afterwards, in the same year, the society was incorporated, under the provisions of the statute relating to benevolent, religious, scientific, fraternal, beneficial, educational, and miscellaneous associations, now article 10 of chapter 32, Revised Statutes 1929, Missouri Statutes Annotated, page 2288, under the corporate name of St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis, Missouri, by a *pro forma* decree of the Circuit Court of the City of St. Louis, and the church property was conveyed to the corporation in its corporate name.

The statute, section 4997, Revised Statutes 1929, Missouri Statutes Annotated, section 4997, page 2290, under which the church was incorporated, provides that the Secretary of State shall issue a certified copy of the articles of agreement, with the several certificates thereon, as filed in his office, "which certified copy shall be the charter of the corporation."

Section 5005, Revised Statutes 1929, (Mo. St. Ann., sec. 5005, p. 2294), reads as follows:

"Every corporation created under this article shall make by-laws for its government and support and the management of its property, and therein provide, unless such provision is already made in its charter, for the admission of new members and how they shall be admitted, and prescribe their qualifications. Provision may also be

made in such by-laws for the removal of officers for cause, and for the expulsion of members guilty of any offense which affects the interests or good government of the corporation, or is indictable by the laws of the land: *Provided, always,* that such by-laws shall be conformable to the charter of such corporation, and shall not impair or limit any provision thereof or enlarge its scope, and shall not be contrary to the provisions of the Constitution or laws of this state.''

The constitution of the corporation, as set out in the articles of agreement, is as follows:

### ''Article I.

''The name of the Congregation shall be the St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis, Missouri.

''The said Congregation shall always be connected and united with the One Holy Apostolic Church, which recognizes the Catholic Roman Pope as the head on earth in the Church of Christ. The said Church, however, uses in all its divine services only the Greek Catholic Rite in the ancient Slav language and in this is distinguished from the Roman Catholics, who use the Latin Rite.

### ''Article II.

''Said Congregation may acquire and own its own church and parsonage and the real estate upon which the same may be situated or located, but the Congregation and its church, with all its belongings, shall always be under the jurisdiction and under the absolute supervisions of the present Greek Catholic Ruthenian Bishop in the United States of America, Right Rev. Soter Stephen Ortynsky, and, in case of his death or resignation of his rightful successor in office of the same rite, duly appointed by the Roman Pope, and no decision of the church members, or trustees of the church, can deprive him or his successors of those rights of jurisdiction and authority over the said church.

### ''Article III.

''Males and females of the church who will abide by this Constitution and live up to the obligations of the church as Christians, that is, attend the church services, go to confession at least once a year and contribute regularly to the monthly collections, may become members.

### ''Article IV.

''Only a Greek Catholic Ruthenian Priest, having authority from his Ruthenian Bishop, can hold services in the aforesaid church and there perform his pastoral duties. He shall, by virtue of his office, be president of the congregation, and no meeting of the congregation can be held without his knowledge.

### ''Article V.

''The number of the members of the Board of Trustees shall be five and shall consist of the pastor, who is President by virtue of his office, Vice-President, Financial Secretary, Recording Secretary and Treasurer, elected at annual meeting for one year.

"The duties and obligations of the members of the Board shall be prescribed in the By-Laws of the Congregation, to be adopted by its members.

"Such further officers may be elected by the Congregation as may be determined in the By-Laws.

"Article VI.

"Annual meeting of the Congregation shall be held at 3:00 P. M. on the last Sunday of each year. Quarterly meetings and special meetings may also be held at such times as may be fixed in the By-Laws."

The by-laws are a copy of the Constitution with certain additional provisions.

One of these additional provisions is as follows:

"Said Bishop, and his rightful Successors in office, shall keep for all time, the Church properties entirely in his own name: in trust, however, so that said Church may not fall into the hands of people of other Religious or Nationalities, and the temporal administration of the Church property shall remain in the hands of the Church officers, under the supervision of the aforesaid Greek Catholic Ruthenian Bishop."

Another is as follows: "The monthly dues for married members shall be one dollar and for single members fifty cents."

Another is as follows:

"A person cannot remain a member of this congregation who fails to go to Confession and Holy Communion at Easter, who causes public scandal by his manner of living, who attends the services of non-Catholic Churches, or who begins or conducts a lawsuit against this congregation, with a view to transferring it into the hands of its enemies. Any member who is guilty of any one of the aforesaid acts, ceases to be a member of this congregation, and by such act loses all rights to its property."

Another, respecting meetings of the congregation, is as follows:

"A majority of votes shall decide all questions. Twenty-five members shall constitute a quorum. A member wishing to speak shall give his name and surname to the Presiding Officer, must confine himself to the subject, and speak respectfully and not insult others; otherwise, he will be deprived of his right to speak.

"Every member who has paid his congregation dues and is not in arrears more than two months (unless he has been out of work or in ill health for some time) shall have the right to speak at meetings, and, after being a member for six months the right to vote at any meeting."

Defendant Reverend Joseph Haniak was a member of the Catholic Church of the Oriental Greek Rite, having been duly ordained as a priest in Europe. He came to this country in 1921. He became the pastor of St. Mary's Assumption Ruthenian Greek Catholic Church

of St. Louis, on January 1, 1933. He was appointed as pastor by Bishop Bohachevsky, of Philadelphia, as follows:

"This is to certify that Rev. Joseph Haniak is appointed by me as Bishop of the Ruthenian Greek Catholic Diocese pastor of Assumption of the B. V. M. Ruthenian Greek Catholic Church in St. Louis, Missouri, and of St. Mary's Greek Catholic Ruthenian Church in Madison, Illinois, and as such he is duly authorized and empowered to celebrate the Holy Mass and administer the Sacraments to the Ruthenian (Ukranian) Greek Catholic faithful in the said cities."

Reverend Joseph T. Donovan, a teacher of canon law at Kenrick Seminary, testified as follows:

"There is but one Catholic Church. It has many rites. The church in question belongs to the Oriental Greek rite, under the Pope of Rome. The Bishop appoints the pastors in the Oriental Greek Rite churches. The Bishop is appointed by the Pope. In no place have the parishioners anything to do with the choosing of the parish priests in the Catholic churches. Within the church there are provided tribunals for the hearing of complaints, and they have graduated steps until they reach Rome. The matter of running the church and conducting the service is left largely to the priest and Bishop. If one is dissatisfied he takes the matter to the Bishop. If he don't get relief from the Bishop he appeals to the Apostolic Delegate in Washington. He is supposed to settle all controversies that are brought before him within three months having to do with the Greeks and Ruthenians. It can be brought before him by writing a letter, or in a formal way, and the Apostolic Delegate, if he considers the complaint entirely unfounded can disregard it, otherwise he will pass on the complaint one way or the other, and those dissatisfied with his ruling can take it immediately to the Congregation of Oriental Affairs in Rome. And if he is dissatisfied with either the Diocesan or Apostolic Delegate's ruling he can take it before the Congregation of Oriental Affairs, or appeal directly to the Pope.

"This Greek Ruthenian Catholic Church located in St. Louis is not part of the Diocese of St. Louis. It is not under Archbishop Glennon's jurisdiction. It is under a Bishop located in Philadelphia. That Bishop is appointed by Rome, and is given jurisdiction over certain churches within a certain district, over all the Greek Ruthenian Churches in the United States of the Greek rites, and the local diocesan authorities have no control over that Bishop. The Bishop can remove a pastor at will. The removal of a Priest is under canon law.

"This is a Greek diocese here in St. Louis. The people are under the jurisdiction therefore of the Greek Bishop of Philadelphia. The Apostolic Delegate is the representative in the United States of the Pope. The Congregation of Oriental Affairs meets in Rome.

"The pastor passes upon the qualifications for membership, and then if it is not satisfactory to the person passed on, he appeals to

the Bishop. The pastor declares who is a person of good standing in his parish, then if he is dissatisfied with the ruling of the pastor he appeals to the Bishop.''

Reverend Linus Lilly testified as follows:

''I am regent of the law school of St. Louis University and professor of law. I taught canon law for sixteen years in the Jesuit Seminary of St. Louis University.

''There are tribunals within the Catholic Church for hearing the various disputes that arise between Catholics in regard to the Catholic administration of the church and the parish. There are tribunals within the church that govern both the Oriental and Latin rites. The church provides tribunals within its own organizations for settling all disputes. It is a decree of the Catholic church that every Catholic who has attained the age of reason must go to confession and communion at least once a year at Easter time, and failure to do that ordinarily severs one's connection with the church. They are not Catholics in good standing. They are not active members of the Catholic church.

''Under the law of the Catholic church the pastor, under the Bishop, is the governing force of the parish, and the pastor determines who are members in good standing, and if the member is dissatisfied with the pastor's ruling he appeals to the Bishop. If he is dissatisfied with the ruling of the Bishop he appeals to the Apostolic Delegate or to the Holy See, depending upon the matter in question. Ordinarily, the recourse would be to the Apostolic Delegate. If you are dissatisfied with his ruling you go to the final tribunal in Rome. Ordinarily the Congregation of Oriental rites would determine matters between the pastor and the Bishop. There are about eleven different Congregations having jurisdictions over different types of disputes. There are three tribunals. They are the courts of last resort, subject to the approval of the Pope.

''It is the fundamental law of the church in all disputes between the parishioners and the parish priests that both sides must resort to the tribunals within the church, and the church provides ample opportunity for all to be heard.

''If an election is held in the church to elect officers, the ones to determine who has the right to vote is the pastor, and if a person is dissatisfied he takes the matter to the Bishop and then on to Rome.''

It appears that a controversy developed in the St. Louis church between the members calling themselves Ruthenians and those calling themselves Ukranians. It appears that the Ruthenian members wanted Father Haniak removed as pastor, because, as they claimed, he was a Ukranian.

In January, 1934, the Ruthenian group employed counsel, who wrote the Right Reverend Constantin Bohachevsky, Bishop at Philadelphia ''regarding the controversy and factionalism that exists in the parish

of St. Louis St. Mary's Assumption Ruthenian Greek Catholic Church located at Dolman and Hickory Streets.'' No particular issue is mentioned in this letter as to which the ruling of the Bishop was desired, but the Bishop was informed that unless a response was received within ten days suit would be brought.

On March 27, 1934, counsel wrote the Most Reverend John H. Cicognani, Apostolic Delegate, at Washington, D. C. In this letter the Apostolic Delegate was informed that for over a year there had existed in the parish factionalism between the Ukranian group and Ruthenian group, and that the controversy had culminated in a lawsuit brought by Father Haniak in an effort to transfer the church property into the hands of the Ukranian group and to change the name from Ruthenian to Ukranian, and that counsel had successfully resisted this action in court, and that unless he heard from the Apostolic Delegate within a reasonable time he would bring an injunction suit against Father Haniak.

On April 2, 1934, the Apostolic Delegate answered the attorney's letter as follows:

''I acknowledge receipt of your esteemed letter of the 27th ult., in reference to the situation in the Parish of the Assumption of the Blessed Virgin Mary in St. Louis, Mo.

''In reply thereto, I beg to say I have called your letter to the attention of Bishop Bohachevsky, who, I am confident, will continue his efforts to bring about a peaceful settlement between the two factions.''

We do not find that the evidence shows that there was a suit brought by Father Haniak in an effort to transfer the church property into the hands of the Ukranian group, though there was a petition filed in the circuit court seeking to amend the charter of the corporation by changing the name of the Congregation from St. Mary's Assumption Ruthenian Greek Catholic Church to St. Mary's Assumption Ukranian Greek Catholic Church. This petition was denied by the court.

The evidence shows that the annual meeting of the Congregation was held on the last Sunday in December, 1933. That meeting was not held at three o'clock in the afternoon, and on this account was considered to be an illegal meeting.

Father Haniak called a special meeting to be held on July 29, 1934, at three o'clock in the afternoon. Prior to this meeting he went over the list of the membership and issued cards to those who were in good standing and entitled to vote. He undertook to exclude those from the meeting that were not entitled to vote. When the members assembled he asked those who did not have cards and were not entitled to vote to leave the meeting. No one left, and Father Haniak thereupon declined to call the meeting to order, and announced that another meeting would be called. Thereupon some of the members

left and those remaining proceeded to hold a meeting. Father Haniak testified that of those remaining only thirteen were eligible to vote, the others not being members in good standing on account of not having paid their monthly dues or not having attended communion or confession according to the law of the church. At that meeting it is alleged that plaintiff George Olear was elected vice-president, that plaintiff Myron Bishko was elected financial secretary, that plaintiff Sylvester Warycha was elected recording secretary, and that defendant Frank Chura was elected treasurer of said St. Mary's Assumption Ruthenian Church of St. Louis, and that by virtue of such election such officers were duly elected trustees of said church.

Wasyl Galayda testified: "After this meeting we tried to get the records and we wrote the Bishop that if he don't remove the pastor we will file suit. The trustees wrote the Bishop. We got no answer from the Bishop. We then wrote the Apostolic Delegate at Washington, D. C., and we got no answer." What the letters contain is not shown. What grounds, if any, were urged in the letters for the removal of the pastor is not shown.

The evidence shows, without dispute in the record, that Father Haniak held mass every Sunday at the church; that he held confession there regularly; that he gave Communion there every Sunday; that nobody was in any way prohibited from practicing his religion in the church; that all the religious facilities of the church were open to everybody; that baptisms were held there and marriages performed and all the religious duties were carried on there; that nobody was prohibited from using them; that any member could come and go to Mass and go to Communion and go to confession and do anything that a Catholic can do; that no member was discriminated against in any way; that the church property was being used exclusively for Catholic church purposes and was used for no other purpose of any kind, character, or description; that the priest house was simply used as a place for the pastor to live in; that the pastor lived in that house.

Wasyl Galayda further testified as follows: "Ruthenia is over in Poland, in Galecia. The nation of Ruthenia is in Poland. It belongs to Poland now; before the war it belonged to Austria. I don't know if it has ever been a nation of its own. Ukrania is in Russia, in Kiel. It was never a nation of its own.. It belongs to the Russian government. I came from Galecia. The people call themselves Ruthenians in religion, but in plain language that is Russian. Sometimes they used to call them Little Russians. Ukranians and Ruthenians are all Russians."

The evidence shows that the Ruthenians and Ukranians are of the same race and speak the same language. This accords with what is said of them in the Encyclopedia Brittanica, as follows: "The Ruthenians are nothing more nor less than Ukranians, and their linquistic

and ethnographical features are described under the same head." This is also the view apparently taken by Father Haniak.

It will be observed that under the constitution of the St. Louis congregation as set forth in its charter the church property shall always be under the jurisdiction and under the absolute supervision of the Bishop. This also appears to be the law of the church, and ordinarily the title to church property is taken and held in the name of the Bishop.

It appears that defendant Reverend Haniak was, by virtue of his office as pastor of the St. Louis congregation, president and member of the board of trustees, and the other defendants were officers and members of the board for a number of years prior to the meeting of July 29, 1934.

The trial resulted in a judgment for plaintiffs, as follows:

"Wherefore, it is ordered, adjudged and decreed that the defendant, Reverend Joseph Haniak be and he is hereby enjoined from acting as Pastor, Spiritual Guide and Leader and President of the said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis; that the defendant Michael Dmytryszyn be and he hereby is enjoined from acting as Vice-President of said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis unless and until elected to said office; that the defendant, William Bilyk, be and he hereby is enjoined from acting as Recording Secretary of said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis unless and until elected to said office; that the defendant, Harry Gryssa, be and he hereby is enjoined from acting as Financial Secretary of said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis unless and until elected to said office, and that said defendants, Reverend Joseph Haniak, Michael Dmytryszyn, William Bilyk and Harry Kryssa be and they hereby are and each of them hereby is enjoined and restrained from acting as Trustees of said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis unless and until elected to said office and that said defendants be and they hereby are and each of them hereby is ordered and directed to turn over to the plaintiffs, George Olear, Sylvester Warycha and Myron Bishko forthwith all books, papers, records and moneys in their possession belonging to said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis, and that the defendants be and they hereby are and each of them hereby is enjoined and restrained from excluding plaintiffs from membership in said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis and from denying to plaintiffs the right to vote at elections held by said St. Mary's Assumption Ruthenian Greek Catholic Church of St. Louis."

Defendants, appealing here, seek a reversal of the judgment.

It is settled law that when a person becomes a member of a church, he thereby submits to the ecclesiastical jurisdiction in ecclesiastical

matters, and has no legal right to invoke the supervisory power of the civil courts so long as none of his civil rights are involved. [54 C. J. 87.]

Ecclesiastical questions belong to the ecclesiastical tribunals, and their decisions thereon are binding, conclusive, and not reviewable by the civil courts. Such decisions have the same effect in proceedings before a civil court as the judgment of any civil court of competent jurisdiction. [54 C. J. 88.]

An ecclesiastical matter is one that concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of the membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church; and all of such matters are within the province of the church tribunals and their decisions will be respected by the civil courts. [54 C. J. 88.]

It is generally held that, where a civil right or the right of property depends upon some ecclesiastical matter, such as doctrine, discipline, or church government, the civil court, where the question may arise, will take the ecclesiastical decisions, out of which the civil right has arisen, as it finds them, accepting those decisions as matters adjudicated by another jurisdiction, and until an ecclesiastical tribunal having final jurisdiction to decide the question has determined it, the civil court will not assume to do so. [54 C. J. 90.]

The deposition or removal of a minister or pastor, and the grounds therefor, are purely ecclesiastical matters, and the civil courts will not review the decision of competent ecclesiastical tribunals in regard thereto. Even a court of equity will not consider the question involved until all ecclesiastical remedies have been exhausted. Nor will the civil courts take original jurisdiction of such matters where there are ecclesiastical tribunals competent to deal with them. [54 C. J. 92.]

The question who are the officers of a religious society is to be determined according to the discipline of that society, and civil courts will not review the decision of a competent ecclesiastical body upon a question involving the election of officers. [54 C. J. 92.]

The law, as derived from a review of the decisions, is stated in 23 Ruling Case Law, at page 449, as follows:

"As regards the purely ecclesiastical or spiritual feature of a church or religious society, the civil courts have steadily asserted their utter want of jurisdiction to hear and determine any controversy pertaining thereto. On the other hand, the civil courts have, without hesitation, exercised their jurisdiction to protect the temporalities of such bodies. Wherever rights of property are invaded, the law must interpose equally in those instances where the dispute is as to church property as in those where it is not. How far the civil courts will

interfere in the affairs of a religious body where property rights are involved is a question which has been addressed to many courts of this country. Often the controversy as to the right of property grows out of a controversy as to creed, doctrine, or teaching. While all of the rulings of the American courts cannot be said to be entirely uniform, the great weight of authority is to the effect that, if a religious organization has, under its form of government, a tribunal constituted with jurisdiction to decide differences between its members as to creed, teaching or doctrine, the civil courts will not undertake to review or revise the judgment of the church tribunal in reference to such matters. The judgment of the constituted church tribunal is absolutely conclusive upon the civil courts, whether, in the opinion of the judges of such courts, the decision appears to be right or wrong. Where a right of property turns upon such a decision, the civil courts will allow the property to go in that direction in which the decision of the church tribunal carries it. According to the rule broadly stated by some courts, when a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the right and nothing more, taking the ecclesiastical decisions out of which the civil right has arisen as it finds them, and accepts such decisions as matters adjudicated by another legally constituted jurisdiction. In some cases, however, it has been said that the decisions of the church tribunals are persuasive, and not to be deported from by the civil courts except where the decisions are clearly wrong, and some courts have expressly repudiated the doctrine that the decision of an ecclesiastical tribunal is conclusive as to its own jurisdiction and binding on the civil courts in the settlement of property rights. It may be said, however, generally, that to justify the refusal of the civil court to accept the action of the ecclesiastical tribunal as conclusive, upon the ground that such action involved an infraction of the fundamental laws of the order, a clear case of such infraction must be presented.''

In Boyles v. Roberts, 222 Mo. 613, 121 S. W. 805, in an opinion by Judge GRAVES, concurred in by four judges, our Supreme Court ruled as follows:

''If no civil or property rights are involved, the courts accept the decrees of ecclesiastical judicatories, not because they are bound by such decrees, but because a civil court has nothing to do with the subject-matter of such decrees; but where property rights are involved, civil courts do not register as their own the church decrees, even on matters of doctrine and of faith, but investigate them for themselves. And if, in determining the civil or property rights of the parties, it becomes necessary to investigate the articles of faith of a church and the written documents of its judicatories, that will be done, even to the extent of determining whether or not those judicatories have put the right meaning upon those articles.''

On motion for a rehearing in that case, in a concurring opinion by Judge VALLIANT, in which four judges concurred, the court ruled as follows:

"Doubtless many of the points. of difference between different churches arise because those outside of a particular church interpret its dogmas to mean what the church itself says they do not mean. The interpretation put on its dogmas by the church itself is binding on its own members, but not on those who are not its members, and a person outside has a right to put his own interpretation on them when they concern him and to govern himself accordingly. . . .

· "Therefore, in a case involving title to property, if a question arises as to the meaning of certain clauses in the Confession of Faith of a particular church and if the parties litigant are all members of the same church and if the highest ecclesiastical court of that church has put on the disputed clauses a certain interpretation, this court would adopt that interpretation as conclusive; but if the parties litigant on one side were not members of the church, we would have to take the written Confession of Faith and interpret it as we would any other written instrument."

Of. the opinion by Judge GRAVES in Boyles v. Roberts, our Supreme Court in Hayes v. Manning, 263 Mo. 1, 1. c. 38, 172 S. W. 897, said: ·

"The rule is thus announced here by a divided court in an elaborate and exhaustive opinion by GRAVES, J. (Boyles v. Roberts, 222 Mo. 613), in the reasoning and conclusions of which we are unable to agree."

In the Hayes case the court at page 39 further said:

"The question as to the extent to which civil courts will interfere in the affairs of a church, where property rights are involved, has been considered and determined by many courts of last resort in our different States and by a number of subordinate tribunals. The rulings have not been wholly uniform, but the pronounced trend of authority is that of a church, as an organization, has created a tribunal, or, as termed in the Presbyterian government, a 'judicatory,' having jurisdiction to determine differences between its members as to creed, doctrine or discipline, the civil courts will not attempt to review or revise the judgments therein rendered. The lack of uniformity in the rulings of the civil courts consists in the fact that in some the decisions of the church courts are held to be persuasive and are followed by the civil courts except when they are held clearly to be wrong, while in others, if the matter in controversy relates to creed, doctrine or discipline, the judgment of the church court is held to be conclusive upon the civil courts, although property rights may be incidentally involved."

And then the court, after reviewing the decisions in other jurisdictions, at page 42, said:

"The great weight of authority supports the rule announced in the foregoing cases that the decisions of the highest court of a church

as to purely ecclesiastical questions within the jurisdiction of such courts to decide, will be accepted as conclusive by the civil courts in the determination of property rights.''

In Watson v. Jones, 89 U. S. 679, 1. c. 727, the court, speaking with reference to the class of cases where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some judicatory over the whole membership of that general organization, said:

''In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority, is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.''

It is clear that whatever property rights may be involved in the present case must rest upon the decision of matters purely ecclesiastical, and whether we regard the decisions of the church tribunals as conclusive or merely persuasive, we think under the facts of this case we should be guided by such decisions. To say the least, the plaintiffs should be required to exhaust the remedies within the church, provided for the settlement of ecclesiastical controversies, before resorting to the civil courts. We think the evidence fails to show that plaintiffs submitted the matter in controversy to either the Bishop or the Apostolic Delegate in a proper manner under the laws of the church, and it is undisputed that they made no attempt whatever to get the matter before either the Congregation of Oriental Affairs or the Pope at Rome. The letter written by counsel to the Bishop stated no definite complaint or issue for decision of the Bishop, but undertook to fix the time within which the Bishop should act, else resort would be had to the civil courts. The letter of counsel to the Apostolic Delegate was likewise more in the nature of a threat of resort to the civil courts than a complaint for the decision of the Apostolic Delegate. This letter, however, did not remain unanswered, but counsel was informed that it had been called to the attention of the Bishop. What the plaintiffs did afterwards with respect to taking the matter in controversy up with the Bishop and the Apostolic Delegate is not shown, further than that, after the meeting of July 29, 1934, letters were written to the Bishop and the Apostolic Delegate, which it is said remained unanswered. In one of these letters to the Bishop it appears a demand was made that the pastor be removed, else suit would be brought. Otherwise what was

said in these letters is not shown. Not even the substance of the letters appears. We do not mean to say that the matter in controversy must have been presented to either the Bishop or the Apostolic Delegate in a formal way, but it was, of course, essential that the matter complained of and the grounds of the complaint be made to appear. Moreover, under the law of the church, as shown by the evidence, if the complaint as presented appeared to be unfounded it was properly disregarded, which it would seem amounted to a decision against the complainants. But, be all this as it may, the undisputed fact remains that the plaintiffs made no attempt whatever to take the matter in controversy to Rome for decision.

The Commissioner recommends that the judgment of the circuit court be reversed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly reversed. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.