R. E. STONE, MAURICE TURLAND, OTIS STEARNS AND J. W. SAVAGE, MEMBERS OF THE GENERAL ASSEMBLY OF THE CHURCH OF CHRIST, A VOLUNTARY ASSOCIATION, FOR THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, APPELLANTS, v. A. W. BOGUE, R. H. RIEGER, CLARENCE DOBSON, L. M. THORNTON, S. F. BRONSON, H. S. ARMSTRONG, C. M. BELCHER, R. G. NEWBY, MRS. JESSIE FARBER CHAPMAN, THE BANK OF INDEPENDENCE AND THE FIRST NATIONAL BANK OF INDEPENDENCE, RESPONDENTS.—181 S. W. (2d) 187.

Kansas City Court of Appeals. June 5, 1944.

*S. Ralph Stone* and *Walter A. Raymond* for appellants.

*W. Raleigh Gough* for respondents.

SPERRY, C.—This is a suit in equity by R. E. Stone, Maurice Turland, Otis Stearns, and J. W. Savage, plaintiffs, bishops and members of the Church of Christ, against A. W. Bogue, R. A. Rieger, and Clarence Dobson, bishops and members of said church, L. M. Thornton, S. T. Bronson, H. S. Armstrong, C. M. Belcher, and R. G. Newby, members and apostles of said church, and Mrs. Jessie Farber Chapman, a member and general secretary of said church, defendants, to secure possession, control and custody of the funds and property of said church. From a judgment for defendants plaintiffs have appealed.

The Church of Christ is a voluntary, unincorporated religious society, having no written constitution or by-laws. Joseph Smith founded the Reorganized Church of Jesus Christ of Latter Day Saints. Brigham Young headed the first great revolt in that church and led his disciples to Utah. The Church of Christ derives through the Hedrickites, who separated from the Reorganized Church of Jesus Christ of Latter Day Saints after that church was established at Independence, Missouri. From the Hedrickites grew the "Temple Lot" church; and from the "Temple Lot" church the Church of Christ is an off-shoot. A generally similar form of church government adheres in all of the churches above named.

The membership of the Church of Christ is made up of the membership of some thirty-four local churches of that denomination, located in a number of States and in Canada, and of individual members who adhere to its doctrine but who are not members of any local church. Each local church maintains its own pastor and carries on its activities with funds contributed to it locally.

The supreme and final governing power of the general church is vested, by custom and practice during a period of years, in the General Assembly. The General Assembly is not made up of delegates or representatives of the local churches, but consists of such of the members of the various local churches, and of its adherents who are not affiliated with any local church, as may attend the sessions of the General Assembly. It has met annually in Independence for many years. The total membership of the church is approximately

1500. The General Assembly would, therefore, if all members were present, consist of approximately 1500 members, each of whom would have a voice and vote in its deliberations and decisions.

The general spiritual supervision, watch and care of the church is vested in twelve apostles, known as "The Twelve," called and designated by God; and the control of the temporal affairs of the church is vested in seven bishops, who have the custody and general control of the church's finances and property. It is the belief and practice of the church that God gives messages, on occasion, to various individuals, through Saint John'the Baptist (and possibly others). Some of said messages have to do with the spiritual teachings of the church; in others instructions are given regarding the appointment or the "silencing" of apostles and·bishops. Apostles are ordained by "The Twelve" and they also have power to select and ordain bishops; but their action in these matters may be set at naught by act of the General Assembly, which also has power to remove any general officer. It is the custom and practice that the membership of the church be informed regarding messages that are received, and frequently such information is disseminated through the church paper, "The Voice of Warning." It is also the custom and practice that messages be discussed by the membership of the church at its General Assembly and that the divinity or lack of divinity of said messages be determined by a majority vote of the members of said General Assembly. While the action of "The Twelve" with reference to appointment or silencing of apostles and bishops is subject to approval or disapproval of the General Assembly, nevertheless it is the custom and practice that the action of "The Twelve" with reference to such matters is legal and controlling until disapproved by a majority vote of the General Assembly.

This lawsuit has its roots in a controversy growing out of whether or not certain messages, known as 56, 57, 58, 59 and 60, claimed to have been delivered to Apostle Draves through Saint John the Baptist, were, in fact, of Divine origin. "The Twelve," by majority vote, held that said messages show evidence of human tempering. Upon motion, duly put to the General Assembly by plaintiff, R. E. Stone, a majority of the membership, under cloture, voted not to sustain "The Twelve" on this matter, concluded the divinity of the disputed messages, and ordered that they be considered as on a par with the Bible, Record of the Nephites (Book of Mormon), and with the fifty-five preceding messages. This action was taken on June 7, 1943, at a regular business session of the General Assembly, which had been duly called and was then in session at the regularly chosen, designated, and publicised place of meeting, a church house on Kansas Street, in Independence. Adoption of this motion brought the whole matter to a head.

"Future meetings of this Assembly, will be held in this building "The Twelve" caused to be read to the members then congregated a manifesto wherein it was declared that the action of the Assembly, with reference to the adoption of undebatable motions the previous afternoon, was contrary to the rules of order as adopted by the church, illegal and void; and declared that:

"Future meetings of this Assembly will be held in this building under the Charge of the Twelve and Bishops as previously announced. We cordially invite all who wish to worship with us in peace, and seek the will of the Lord, as we were admonished ten years ago in Message 30."

On June 8, at about 9 A. M., plaintiff Stone, and others of his party, arrived at the regular meeting place, to which the Assembly had adjourned, and found the door open and a religious service in progress, presided over by Apostle Newby, one of the defendants. Some members of the Stone faction were also in the meeting. Plaintiff faction remained outside, near the door, and conferred. They did not enter, or offer to enter. There was no display of force or exchange of words on the part of either faction. Eventually, plaintiff faction was invited by one of its members to meet at a private home in Independence, to which place they repaired. Some members of plaintiff faction went into the meeting at the church house and invited some of those attending said meeting to come out and attend plaintiff meeting, which they did, all without disturbance, exchange of words between the factions, or undue commotion.

Thereafter, plaintiff faction proceeded to hold business sessions at the new location. At this meeting all general officers of the church, of defendant faction, were relieved of their duties and "silenced;" and defendant faction, likewise proceeded, by appropriate action, to relieve from duty general officers of plaintiff faction.

Plaintiffs assert that theirs is the majority faction of those attending the General Assembly. Defendants neither dispute nor do they specifically admit the truth of this contention. According to the the minutes of the Assembly the motion, sponsored by Bishop Stone, that the disputed messages be accorded divinity, received forty-four votes while twenty-seven were opposed. Therefore, probably seventy of the 1500 members of the church were present the first day the General Assembly met. At any rate, that number voted on the motion. As to whether or not others came later and, if so, with what faction they affiliated, there is no evidence.

Over matters of religious belief our courts have no jurisdiction. [45 Am. Jur. 768; Olear et al. v. Haniak et al., 235 Mo. App. 249, l. c. 259, 131 S. W. (2d) 375.] The membership of the various churches, and all other men, are possessed of the inalienable right to believe what he or she chooses to believe in the field of religion. Each enjoys full liberty to worship God or not to worship Him, in accordance with

the dictates of his own conscience. It is his privilege to practice his religion as he sees fit, subject only to the power of the State to intervene in the interests of the peace and good order of society. [45 Am. Jur. 749.] These are among the most sacred of the rights guaranteed to our people. Freedom of religious profession and worship cannot be maintained if the civil courts exercise jurisdiction over ecclesiastical affairs. [Hayes v. Manning, 263 Mo. 1, l. c. 43.] Without freedom of religious thought and worship a people, such as ours, made up of a large number of differing racial and religious groups, may not long remain united under one government. The history of man is interwoven with the story of religion, and the whole speaks eloquently of the futility of any attempt to control the ebb and flow of man's religious impulses, and of the wisdom of recognizing them as being imbued with the freedom and power of the ocean tides.

Because of man's inherent religious urge, and of his uncontrollable conscience and thought, religious beliefs and practices have attained nobility and beauty transcending all other things. He usually associates himself with others who profess to believe as he does; and a group thus formed is known as a church. From time to time individual members of an established church cease to think and believe in accordance with the tenets of the church as formulated and as expounded by a majority of the membership and by the priesthood:

"A Hair, they say, divides the False and True;
Yes; and a single Alif were the clue—
Could you but find it, to the Treasure house,
And peradventure to The Master Too;"

Such individuals may separate from the church and either associate themselves with another sect of whose tenets they approve, or gather others around them and establish a new church, as did Luther, Calvin, Wesley, and a host of others. With such controversies, over theological questions, the civil courts are not concerned. Such decisions are within the exclusive jurisdiction of ecclesiastical courts. [Landis v. Campbell, 79 Mo. 433, l. c. 436; 45 Am. Jur. 750; Olear v. Haniak, *supra*; Watson v. Garvin, 54 Mo. 353, l. c. 378.] However, on occasion, differences arise over questions of faith and practice, or over other matters, which shake a church to its very foundation, resulting in such a schism as to lead to a division of the entire membership, and a large segment of the membership leaves the church in a body. [Hayes v. Manning, *supra*.] Such is the situation in this case. The courts are without jurisdiction to intervene in such a case except to protect the civil rights of members or to adjudicate property rights; 45 Am. Jur. 749; Note 24 L. R. A. 692 et seq.

This church owns no real estate; and chattels owned by it are of but small value. The real dispute is over custody and control of the cash money owned by the church at the time this petition was filed. The usages and customs of the church throughout its existence

may be looked to for a determination of the question of what body or official is entitled to the use, control and custody of church property. [Russie v. Brazzell, 128 Mo. 93, 1. c. 112.] It seems to be conceded by all parties that by custom and practice, as well as by written rule, the custody and control of funds owned by this church was vested in the bishops, of whom there were seven. The General Assembly had the power to remove them but it had not done so prior to this dispute. It also had the power to supervise and direct them in the discharge of their duties but it had not exercised such power. On the morning of June 8, 1943, before plaintiff faction left the meeting place of the General Assembly, and before either faction had held separate meetings and relieved from duty the officers of the church who affiliated with the opposing faction, the duly selected, ordained and acting bishops of the church were: Stone, Turland, Stearns, and Savage, plaintiffs, and Bogue, Rieger, and Dobson, defendants. That portion of the church money that was located in the United States was in the custody of Bogue; that portion which was located in Canada was in the custody of Rieger: There is no contention made that the separate custody and control exercised by Bogue and Rieger, prior to this dispute, was anything but regular and legal. They had been exercising such control and custody and, in the absence of any contention to the contrary, we will assume that they were duly authorized to do so.

In view of the nature of the church organization, of the general situation here presented with reference to the control exercised by Bogue and Rieger, and of the fact that such control had not been challenged by others of the bishops or by the General Assembly, the following is applicable:

". . . in case of a schism leading to a separation into distinct and conflicting bodies, the numerical majority of members must control the right to the use of the property of the church to which no other specific trust is attached than that it shall be used for the congregation of a religious society, *unless there are within the congregation officers in whom are vested powers of control*, in which case those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property; and in neither alternative will the court undertake to inquire which body adheres more closely to the religious dogmas of the founders." [45 Am. Jur. 769.] (Italics ours.)

The deacons and trustees of a Baptist church sought an injunction regarding the use of church property, and the Supreme Court said:

"These officers have the power, while their authority continues, to determine by whom the property may be used, and have the power to exclude those members who refuse to recognize the authority of the regular organization." [Fullbright v. Higginbotham, 133 Mo. 668, 1. c. 678.]

Defendant Bogue had rented, for the use of the church, the building in which the General Assembly held its meetings and he had possession of the key thereto. It was understood by everyone that on the morning of June 8th the General Assembly would again meet in this building. Bogue had authority to open the building for such purpose. It is not contended that the religious service which was in progress therein, at 9:00 A. M., when plaintiff faction arrived, was in any way improper or that the building was being used for a purpose contrary to the declared object and purpose of the church, or that the persons participating therein were not recognized officers and members of said church. Nor is it contended that any business session had been or was then being held. It was a religious meeting, a prayer service. Plaintiff Stone testified to the effect that the session over which he had been elected to preside was not to meet until 9:30 A. M. At what time the regular business session was to convene is not shown but the defendant faction did not hold such a session until 2 P. M., which session was held at the church.

Plaintiff faction could have entered the church and could have participated in the meeting. No physical violence was threatened or used to prevent such a course. Plaintiffs contend that Apostle Newby, who was presiding at the meeting, weighed 186 pounds and that they were afraid violence would greet any attempt on their part to enter the church and to participate in the service. We are not impressed by testimony as to what they thought, in the absence of any evidence whatever, excepting the avoirdupois of Apostle Newby, to give rise to such apprehension. Newby testified to the effect that he would not have voluntarily given up to plaintiff faction; but Newby did not say he would have offered physical violence. What may have been in Newby's mind was wholly unknown to plaintiffs and could not have formed a legal basis for their professed belief, months later, that their entry into the church would have been greeted with violence. In fact, various of the members of plaintiff faction did enter, contacted members of the congregation, and induced said members to leave the church and go to plaintiffs' meeting, all without provoking even a verbal reprimand or controversy.

The situation here presented is, in this respect, entirely different from that presented in Clevenger v. McAfee, 170 S. W. (2d) 429. Nor is it at all comparable to that described in evidence in Gust v. Montgomery Ward & Co., 136 S. W. (2d) 94, and Hurst v. Montgomery Ward & Co., 145 S. W. (2d) 992, where defendants' employee made verbal threats of violence, accompanied by physical action. The rule in regard to proof required to establish false arrest is declared in Humphreys v. St. Louis & San Francisco, 286 S. W. 738, l. c. 741, and similar proof is lacking in this case. Plaintiffs' contention that cases based on fraud and deceit are analogous to the situation here presented, and their claim that plaintiffs' were not required to "test out"

the belligerency and physical prowess of Apostle Newby and his followers but were entitled to act on appearances and retire, might have application if there had been physical appearances or a demonstration upon which a reasonable person could base a belief that physical violence would have ensued if they had entered the church. In the total absence of such evidence Goar v. Belinder, 213 Mo. App. 330, and Thaler v. Niedermeyer, 185 Mo. App. 257, are wholly inapplicable, as are the other decisions mentioned in this paragraph.

Plaintiffs contend that they represent a majority of the membership of the church. Probably they do represent a majority, at least of those present in the General Assembly on June 7th. Nothing occurred to prevent any member of plaintiff faction from joining or remaining in the meeting of June 8th. Since that meeting was duly constituted it cannot be deprived of the right to transact the business for which it was called, merely because a part of the membership capriciously withdrew therefrom. [Stryjewski v. Panfil, 269 Pa. 568, 112 Atl. 764, l. c. 765.] Plaintiffs will not be permitted to assume exclusive control of the church property on the assumption, without proof thereof, that they were unlawfully excluded therefrom. After the schism, the true Church of Christ was represented by those who were met, in the authorized manner, at the authorized place, to which the Assembly had adjourned, and were, as a congregation, acting as an organized body in conformity with the law and practice of the church. Even a majority of the church cannot speak for it unless they act at a time and place and in a manner in harmony with church rules, customs and practice. [Garton v. Fitzpatrick, 187 Ala. 273, 65 So. 390, l. c. 392.] Any action taken with reference to the removal from office of Rieger and Bogue, at a meeting not properly called, absent proof of any sufficient reason for holding an irregular meeting and any proof that all members entitled to attend were present or notified, is wholly void and invalid. [54 C. J. 19, 20, 21; Kuhl v. Meyer, 42 Mo. App. 474, l. c. 478, 479; Long v. Harvey, 177 Pa. 473, 35 Atl. 869, l. c. 870, 34 L. R. A. 169; Clapp v. Krug (Ky.), 22 S. W. (2d) 1025, l. c. 1028.] This is true even if defendants and members of their faction constitute only a minority of the membership of the General Assembly and of the church. [Kerr v. Hicks, 154 N. C. 265, 70 S. E. 468, l. c. 470, 33 L. R. A. (N. S.) 529. See also 54 C. J. 74, 75, 76.] The decision in Ostrom v. Greene, 161 N. Y. 353, 55 N. E. 919, cited by plaintiffs, is in harmony with our holding in this case, and with the above authorities.

Plaintiffs contend that, since a majority of the seven bishops joined in this action, they are entitled to custody of the church property, regardless of other considerations. Waiving defendants' contention that the suit was not brought or tried on such a theory, the point must, nevertheless, be ruled adversely to plaintiffs because: (1), by custom and practice Bishops Bogue and Rieger had actual physical custody

of the property and there is no showing that a majority of the board of bishops, or of the General Assembly duly convened, at any time had officially ordered that they be divested of such custody; (2), there was evidence to the effect that Bogue was the duly appointed and acting secretary-treasurer of the board of bishops and, as such, was the proper custodian of the funds and property of the church, and there is no evidence tending to prove that he had been legally removed; and, (3), there was evidence to the effect that Bogue, Rieger, and Dobson, at the time of the trial, were duly authorized bishops and that Stone, Savage, and Turland, plaintiffs, had been "silenced" as bishops, and were then not in office.

In connection with number 3, *supra*, the evidence is: that "The Twelve" "silenced" Stone, Turland and Savage in January, 1943; that said "silence" in custom and practice, was regarded as binding until set aside by vote of the General Assembly, which was done on June 7th; and that the action of the General Assembly, so taken, was set aside by vote of the Assembly on June 8th. Therefore the evidence fails to sustain plaintiffs contention that a majority of the legally qualified and acting bishops of the church joined in filing this bill.

For the reasons herein the judgment and decree should be affirmed and the bill should be dismissed. *Boyer, C.*, not sitting.

PER CURIAM:—The foregoing opinion of Sperry, C., is adopted at the opinion of the court. The judgment and decree are affirmed and the bill is dismissed. *Bland, P. J.*, and *Cave, J.*, concur; *Dew, J.*, not sitting.