Rev. George MILLS, William Trentham, Sadie A. Trentham, Dillard Rhodes, Cora Rhodes and Lona Douglas, Plaintiffs-Respondents,

v.

Rev. Jeff YOUNT, Lafe Shrum, J. C. Shrum, Charlie Sitze, Perry Logan Krekel, Bessie Shrum, Lillian Sitze, Millie Russell, Jo Ann Long, Lorrine V. Krekel, Amanda S. Shell and Nora Shrum, Defendants-Appellants.

No. 8366.

Springfield Court of Appeals.

Missouri.

July 6, 1965.

William H. Frye, Vogel & Frye, Cape Girardeau, for defendants-appellants.

Paul A. Mueller, Jr., Jackson, for plaintiffs-respondents.

RUARK, Presiding Judge.

There is trouble in Plainview Church. Five members of that church and a non-member pastor have sued twelve of their brethren, including a trustee, a deacon, and a pastor, because they charge that the defendants are "adhering to a different faith than the Congregational Methodist Church" and are using the church property in violation of the eleventh edition of the constitution and government of that church. Defendants' cross-bill alleges that they adhere to the original faith and doctrine and that the plaintiffs have adopted and adhere to a faith which is new and different. The circuit court enjoined the defendants "from using the said building and grounds, in any manner whatsoever, for any religious purpose or meeting." Defendants have appealed. We do not have the benefit of any determination of facts or conclusions of law.

The church was founded in 1876. In 1892, one Joseph Shrum and wife deeded a tract for a consideration of one dollar to "William L. Shrum, W. J. Patton, and Perry S. Aldrich, Trustees of the Congregational Methodist Church, known as Plainview Church," to be used as a church house site. In 1925 a deed of correction was made to trustees of "The Congregational Church known as Plainview," the land to be used as a church site and a public cemetery without reversion. It is obviously a rural church and has been used as a place of worship by its congregation; but on occasions other denominations have used it (probably in connection with the public burying ground) for funeral services; and occasionally ministers from other denominations have assisted in church revivals. There are approximately seventy members, some of whom are the descendants of the original grantors. The minutes and evidence show the membership to have been sincere in purpose and devout in their religion; they worshiped together through the years in a spirit of brotherliness. They did not entirely bring this trouble upon themselves. Some of it "trickled down" on them. This requires some history.

The Congregational Methodist Church, or "The Congregational Methodist Church of the United States of America," as it often designated itself in conference minutes, copyrights, and on the front pages of its published disciplines, was organized in Georgia in 1852. It split off from the Methodist Church because of dissatisfaction with the system of governmental and ministerial control. As its name implies, the local church had a congregational method of government and system of worship. The local congregation was largely independent. It called its own pastors and controlled its own property. Nevertheless it had a graduated, associated, connective link with other churches of that name and faith in that it sent delegates to a district conference. The district conference in turn

sent delegates to an annual (analogous to state or territorial) conference, and the annual conference in turn sent delegates to a quadrennial general conference. This general conference had the power to decide certain appeals and questions of doctrine and to make general rules and regulations for the churches.

From the time we have any history (the earliest discipline we have in evidence is the sixth edition of 1898), the church had a constitution and government and twenty-five articles of religion. The constitution provided:

"This conference shall not change or alter any part of our Constitution, so as to do away or destroy our system of worship.

"It shall not change, revoke, nor alter our Articles of Religion. It shall not establish any new standard of doctrine contrary to our present existing and established standards.

"It shall not do away the privileges and rights of our ministers and members to trial by the church or committee; and also of appeals.

"The above restrictions shall remain inviolate."

These provisions continued as inviolate until 1957–1960.

In 1941 there occurred a schism in the general conference which was held in Anniston, Alabama. The Reverend J. A. Cook, president of that conference, is referred to as being the leader of one group; the other was led or represented by the Reverend Marvin Sheffield and by W. J. Alexander, who was secretary of the conference. Sometimes this faction is referred to as "the Texas Group." Without intending any implication, and only for the purpose of easy distinguishment, we will refer to the group which is identified with the Reverend Cook as the "Standpatters"

and the group which is associated with the Reverend Sheffield as the "Innovators." The parties spend much time and effort concerning the doings of the 1941 general conference (the last one held as a united church) in an effort to show "who walked out on whom." It would appear that the brethren completely forgot the admonition of Paul the Apostle, 1 Corinthians, 1:10. The conference opened with a prayer and disagreement, and the disagreement continued. Obviously there was a behind-the-scenes struggle for control of the church organization. The secretary failed, or forgot, to bring the conference records to the assembly. The president insisted upon a committee to examine the credentials of delegates. This was strenuously opposed by the Innovators, the real reason being (from the testimony of Sheffield) that they were afraid the committee would eliminate all delegates who were favorable to and "did believe in the second work of grace." The delegates were required to bring their credentials forward and lay them on the table, but the credentials never were checked because (according to the Standpatters) the secretary put them in his pocket and they disappeared with him when the Innovators left the church and went to a church in nearby Blue Mountain. After a day of recesses, disagreements, and attempts to agree, the conference adjourned. At the commencement of the second day there was a discussion at the door. It was evident that there was an irreconcilable split and an "agreement to disagree." The Standpatters refrained from participating until the Innovators could elect their own president and then leave. Thereupon the Standpatters resumed their business. It would be impossible to say which side had the majority of qualified delegates. The discipline in force at the time of the split was what is called the tenth edition. After this occurrence the Standpatters continued with the same tenth edition under the name or title "Congregational Methodist Church of the United States of America," and the Innovators reprinted the tenth edition of

the discipline and went forward with the name "Congregational Methodist Church." The thing which is obvious is that there was no doctrinal split in the conference itself. Unquestionably doctrine and some change in the form of government was the impelling motive and cause behind those who were promulgating, manipulating, or contending behind the scenes; but, so far as the record shows, no such question came out for vote of the conference. It would appear that a fair portion of the delegates didn't know what the fuss was about. To illustrate: One witness stated, "We thought it was the best for our church, them not knowing anything about it, we didn't feel it was best to take our church in any squabble and stay neutral on this thing until it was settled and then we might take a stand." Another witness said, "We had no part in the conference. We stayed mute." The delegates from the Southeast Missouri Conference (to which Plainview Church belonged) were in the "mute" group.

Thus we have had, since 1941, two organizations professing the same doctrine and using the same discipline containing the constitution and system of government and the same twenty-five articles of religion, but with different officers and, apparently, rather confused, different conference structures. The Standpatters continued with the same doctrine and government until they later issued an eleventh edition and finally a twelfth edition of their own. These editions retained the twenty-five articles of faith and contained very little change in government. However, in 1957 the general conference of the Innovators adopted a new discipline which is their eleventh edition and in the evidence is referred to as the "black book." This new discipline, as we understand the evidence, became official and in force when it was printed and issued in 1960 or 1961. In this discipline were an added five articles of religion, making thirty in all, and it is this addition, the twenty-seventh article in particular, which is the basic cause of the trouble. This twenty-seventh article pro-

claims that "Entire sanctification is that second definite work of grace, subsequent to regeneration, whereby the heart of a justified person is cleansed from the original or Adamic nature, and is filled with the Holy Ghost. If we are able to interpret this addition (and we doubt our competency to do so but do our best from the evidence), it is based upon the belief the first work of grace comes with acceptance of Christ and repentance for sins, but that entire sanctification coming from the Holy Spirit as a second or additional work of grace is necessary to secure release from the sin common to all mankind. Thus, apparently, those who have received the second work of grace have achieved a spiritual superiority to those who have merely been "saved" by acceptance and repentance. We have searched the books for cases involving this doctrine and the only one we find which apparently touches it in some respects is Mt. Zion Baptist Church v. Whitmore, 83 Iowa 138, 49 N.W. 81, 13 L.R.A. 198. There, on occasions, it is referred to as "second blessing," "holiness," and "sinless perfection," and such was held a departure from the accepted faith.

The Standpatters maintain that there can be only one work of grace, "by grace ye are saved through faith. It doesn't say graces. It's grace." "I believe when a man is saved, he is saved. I don't think he has to go back." And counsel, who may perchance be a member of that group, argues that no member who has been saved can become "more holy" than any other member who has received grace and salvation. We note in the preface to the reprint of the tenth edition (under which the Innovators were governed before their adoption of the new discipline) the statement: "[W]e are equal by creation, equal by preservation, and equal by redemption, and that all from the highest to the lowest, who are brought to a saving knowledge of the truth, are upon a principle of equality, required to comply with the same terms and conditions."

The discipline in dispute, the so-called "black book" or eleventh edition of the Innovators, effectively cemented enforcement of belief in the second work of grace as required doctrine by provisions in respect to its ministers. We do not go into detail on this, but it would appear that ministers of the church, even though ordained under the original twenty-five articles, are not qualified to pursue their calling as minister to any flock in the church unless they accept the twenty-seventh article having to do with the second work of grace. It is obvious that some of them are not conscientiously able to do so. Hence they are, in effect, ex post facto excluded. Other changes in the constitution and government involve a tightening of control of membership and ownership of the church property in the conference. It is the contention of the Innovators that this right of control extends to property acquired by the local churches prior to this change in discipline.

█ It is the general rule that, in event of a schism in a church, the right to possession and control of the church property remains in that faction, whether majority or minority, which adheres to the faith, doctrine and established practices of the church as it existed prior to the division. 76 C.J.S. Religious Societies § 71b, p. 853. Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805(4); Montgomery v. Snyder, Mo.App., 320 S.W.2d 283(2); Mertz v. Schaeffer, Mo.App., 271 S.W.2d 238, 240; see Cantrell v. Anderson, Ky., 390 S.W.2d 176. Sometimes it is said, prior to the time the property was acquired. 45 Am.Jur. Religious Societies, § 67, p. 777; Trett v. Lambeth, Mo.App., 195 S.W.2d 524, 531; Henson v. Payne, Mo.App., 302 S.W.2d 44, 50; Fulbright v. Higginbotham, 133 Mo. 668, 34 S.W. 875, 877.

█ Usually the courts exhibit great diffidence in regard to determining a question of theology or doctrine. 76 C.J.S. Religious Societies § 86, p. 873; Trett v. Lambeth, supra, Mo.App., 195 S.W.2d 524(2); Olear v. Haniak, 235 Mo.App. 249, 131 S. W.2d 375, 381; Stone v. Bogue, 238 Mo. App. 392, 181 S.W.2d 187(3, 4). It is only where such determination becomes necessary in order to settle property and civil rights as distinguished from ecclesiastical rights that the courts will be concerned with doctrine, and then not in order to determine which is correct but only in order to determine which of the disputing factions adheres to the original doctrine. Boyles v. Roberts, supra, 222 Mo. 613, 121 S.W. 805(1); see history "Courts and Churches in Missouri" 1956 Wash.U.L.Q. 67; Annotation: 8 A.L.R. 105, 114 et seq.; Annotation: 70 A.L.R. 75; 3 St. Louis U.L.J. 304 (1954–1955); Smith v. Pedigo, 145 Ind. 361, 33 N.E. 777, 778, 44 N.E. 363, 19 L.R.A. 433, 32 L.R.A. 838. It is frequently stated, and is the general rule, that where the church has a connective association in an organization which has a judicatory to determine questions of doctrine within the framework of that faith, the courts will be bound by a determination of that body, prior to schism. Hayes v. Manning, 263 Mo. 1, 172 S.W. 897, 905; Barkley v. Hayes (W.D.Mo.) 208 F. 319, 332–333; Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666, 676; Mack v. Kime, 129 Ga. 1, 58 S.E. 184, 24 L.R.A. (n. s.) 675, Annotation: 699; Brundage v. Deardorf (6th Cir.) 92 F. 214, 228–229; Kedroff v. Saint Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120(13). But while the supreme judiciary of an organization has been said to be both legislative and judicial in respect to doctrinal matters within the basic faith of the church, we do not assent to the proposition that it can sit in solemn judgment to the exclusion of the civil courts as to its own acts (as affects civil and property rights), the effect of which such acts are a departure from the essential denominational faith, and a diversion to another, different, and

repugnant one, and by this means carry the property of one faith over to the other. See 45 Am.Jur. Religious Societies, § 68, p. 779; Mt. Zion Baptist Church v. Whitmore, 83 Iowa 138, 49 N.W. 81, 85, 13 L.R.A. 198; Smith v. Pedigo, supra, 145 Ind. 361, 44 N.E. 363, 366. For the right to religious freedom is not the right to steal churches. Schnorr's Appeal, 67 Penn. 138, 5 Am.Rep. 415, 418.

Fortunately we, in this case, are spared an interpretation of doctrine to determine the added article concerning "the second work of grace" is fundamentally different from the doctrine of those who reject it, because the plaintiffs (Innovators), who believe in the thirty articles, in their petition assert that defendants (Standpatters), who believe in the original twenty-five articles and do not accept the additional five, *have departed from the faith.* They, as well as the defendants, recognize, as the evidence seems to indicate, that there is now a serious, fundamental, and irreconcilable difference in the two doctrines. It was apparently the *underlying* cause of the division of the "old" church. We have no hesitation, therefore, in saying that one group or the other has "departed from the faith," as both pleadings suggest. The question is, which one? This involves a further inquiry into the history of what has happened since 1957–1960 with a view of determining whether the defendants (who still adhere to the faith expressed in the original twenty-five articles) assented to or accepted the thirty articles prior to the local schism or have "waived" any right to object. (See Hayes v. Manning, 263 Mo. 1, 172 S.W. 897 [13]).

Plainview sent delegates to and was therefore a member of the Southeast Missouri Conference. The Southeast Missouri Conference in turn sent delegates to and was a member of the East Tennessee Annual Conference. When it joined the East Tennessee Conference is not clear. It appears by the testimony of plaintiffs' witness

Sheffield that at some time—we do not know when—East Tennessee "came back to our group" (the general conference of the Innovators). And it is the contention of plaintiffs that this brought in the Southeast Missouri Conference, which in turn brought in the Plainview Church.

The constitution and government of the tenth edition provided that the same might be amended by the ratification of two-thirds of the district conferences. The evidence as to whether this change was ever so ratified is rather confusing and indistinct. Two of the national officers, the executive secretary, the Reverend Pitts, and the Reverend Sheffield, testified. Both refer to the new discipline as being the act of the general conference of 1957. Although the plaintiffs, through their officers, had access to the records of this denomination and the evidence of ratification, if such occurred, was peculiarly available to them (the Innovators) and obviously not to the Standpatters, they neither produced such records proving the ratification (see Russie v. Brazzell, 128 Mo. 93, 30 S.W. 526, 528, for example) or made any statement how such ratification was accomplished; *nor did they testify that there had been in fact a ratification* by two-thirds of the district in accordance with the previous constitution.

On the other hand, a witness for Innovators, the Reverend James Mills, who identifies himself not as a national officer but as vice-chairman of the Southeast Missouri Conference, and who himself used the reprint of the tenth edition until 1960 or 1961, testified first that the new discipline was never presented to or voted on by the Southeast Conference. Then he testified, without giving the foundation for his belief or information, that such discipline was presented to and accepted by two-thirds of the districts. We are not entirely sure whether he meant that two-thirds of the districts actually voted favorably to the amendment or that such districts, by their delegates in annual or general conference,

accepted the new discipline. The evidence does not satisfactorily establish that the discipline adopted by the general conference of 1957 was ratified in accordance with the previous constitution. One thing is clear however: if the Southeast Missouri conference ever voted on the acceptance of the new discipline, it did not accept it. But (regardless of whether the new discipline went into effect as a result of adoption of the general conference or as a result of constitutional ratification) the plaintiffs contend that it has "automatically" become the doctrine required of the local congregations and that this local church is "automatically bound" under a sort of falling dominoes theory. It is apparent that some of the churches in the Southeast Missouri Conference are now using the discipline in question. It is apparent that at least one, and perhaps others, adheres to the original twenty-five articles and uses the "old discipline." The basic cause of this dispute is which discipline shall be used by Plainview.

At a conference (session) of the local congregation held on March 23, 1963, some of the members attempted to raise the question, and one member, himself an ordained minister, moved to withdraw from the church organization of the Innovators. The then pastor declared the motion out of order. Then at least two other members, a deacon and a trustee, asked to speak and were refused. No vote was allowed on the use of the "black book" or the question of withdrawal.

At a regular meeting held on June 22, 1963, it became time to call a new pastor (to assume the ministry the following August), and the Reverend George Mills was elected by a vote of twenty-one to three. Subsequently the defendants, or Standpatters, discovered that the Reverend Mills intended to use the disputed discipline (he subsequently testified that he was governed by the new discipline which contained thirty articles), and they published their own call for a special conference which was held in the church on August 10, 1963. This meeting was attended by more persons than voted, including the Reverend Mills who had been previously selected. The Reverend Yount was called as pastor by a vote of twelve to nothing. Thereafter the Standpatters held services in the church on the second and fourth Saturdays and Sundays of each month, for a total of five or six, until suit was filed and a temporary injunction was issued.

■ We have already stated that plaintiffs themselves contend the use of the (old) Standpatters' discipline is a departure from the faith of the (new) Innovators' discipline, and it follows that the two are in conflict. We accept the fact that they are basically repugnant views—as distinguished from differences in interpretation on minor points or "shades of opinion" which do not change the basic and fundamental faith. 76 C.J.S. Religious Societies, § 71, p. 853; see Russie v. Brazzell, 128 Mo. 93, 30 S.W. 526, 531–532; Montgomery v. Snyder, Mo.App., 320 S.W.2d 283; Mertz v. Schaeffer, Mo.App., 271 S.W.2d 238, 242; Mt. Zion Baptist Church v. Whitmore, 83 Iowa 138, 49 N.W. 81, 84, 13 L.R.A. 198; Barkley v. Hayes (W.D.Mo.) 208 F. 319. We have expressed considerable doubt as to whether the plaintiffs have shown that the new discipline was ever amended in accordance with the constitution. The question is then, did the belonging to a district conference, which at some indefinite time went into an annual conference, which at some indefinite time went into the general conference of the Innovators, constitute such a waiver, estoppel, or acceptance of a new doctrine promulgated by that general conference (see Hayes v. Manning, 263 Mo. 1, 172 S.W. 897) as to bind the defendants. Is the local congregation "automatically bound" by reason of

having the connective thread of submission to ecclesiastical determination? We think not. We think this carries the theory of representative estoppel too far when a fundamental change in faith is involved.

We take it that some time after the division of 1941 the Plainview Church "joined" or was swept or dragged into the Innovators' organization by reason of its connective representation. This, until the change of discipline became official, was still an organization proceeding under the same discipline and (officially at any rate) the same faith, with the same twenty-five articles. There is no showing of any waiver, assent, or consent to accept the change wrought by the additional articles. In fact, there was protest and dissent when it appeared in the local church; and that protest and dissent is the cause of this dispute. We think there was no implied assent by connective subjugation.

■ It seems evident to us that the defendants adhere to the "old" faith and that they have not departed from it by assent or consent to the adoption of the new, which, according to the parties pleading, is inconsistent with and repugnant to the old. The will of the full membership in the congregation has not been tested on this; so we cannot say whether defendants represent an actual majority or minority of the church. But, whichever they are, they are entitled to the possession of the churchhouse for religious services so long as they adhere to that established faith and practice.

We are required to render such judgment as we believe should have been entered. It is, therefore, our judgment that plaintiffs' petition be denied and dismissed and that defendants have judgment on their cross-bill; and plaintiffs are, therefore, permanently enjoined from interfering with the defendants and those who may be associated with them in holding religious services in the church.

STONE and HOGAN, JJ., concur.