McBRIDE *et al.* v. PORTER *et al.*

1. **Corporations:** POWER OF MAJORITY. The republican principle which obtains in the civil government of this country, that the whole are bound by the acts of the majority, when those acts are not in conflict with the Constitution, obtain with equal force and uniformity in the government of corporations and voluntary associations of individuals. A majority may dispose of, retain, or occupy and manage the property owned absolutely by the corporation or association, admitting the minority to equal benefits with themselves.

2. —— TRUST PROPERTY. Where property is conveyed to a corporation subject to limitations, and for a specified trust, it cannot be diverted from the use and trust for which it was conveyed.

3. —— APPLICATION OF THE RULE. A deed conveyed property to certain persons "as trustees of the Associate Congregation of Pleasant Divide, subordinate to the Associate Presbytery of Iowa, subordinate to the Associate Synod of North America;" after the union of the Associate and the Associate Reformed churches, a majority of the congregation at

Pleasant Divide refused to assent to the union, while a minority organized as a United Presbyterian church, under the union: *Held,* that the trustees of the United Presbyterian church, while representing a minority of the members of the former association, were the trustees named in the deed, and were entitled to the possession of the property described therein.

*Appeal from Monroe District Court.*

SATURDAY, OCTOBER 15.

ON the 16th day of January, 1851, James S. Carhart and wife, conveyed to certain persons, " as trustees of the Associate Congregation of Pleasant Divide, as subordinate to the Associate Presbytery of Iowa, subordinate to the Associate Synod of North America," two acres of land to be held by " them and their successors, as aforesaid, in trust for said congregation, so long as said congregation shall need it for a meeting house site." Prior to the execution of this deed, but with the understanding it would be made, the congregation, by the voluntary contributions of its members and others, had erected a meeting house on the land conveyed. In May, 1856, the Associate Synod of North America, desiring to consummate a union with the Associate Reformed Church, which had been, prior to that time, the subject of much consideration and communication between the prominent members of those two denominations, by a vote of 133 to 20, approved of a basis of union with the Associate Reformed Church, which was sent to the Associate Reformed Synod for its approval, and at the same time was overtured or submitted to the Presbyteries, and through them to the Sessions of the Associate Church. In May, 1857, it was found by the returns to the Synod, that a large majority of the Presbyteries were in favor of adopting the bases of union, even without amendments; others insisted on certain amendments, and only one Presbytery was opposed to its adoption. The Pres-

bytery of Iowa, within which, was the Congregation of Pleasant Divide, was in favor of adoption without amendment. Thereupon, the Associate Synod, by a vote of 104 to 13, adopted the basis of union, and transmitted the same to the synod of the Associate Reformed Church, then in session, by which it was also adopted with a similar vote. A committee was appointed from each Synod to make arrangements for the union, who reported to their respective Synods; and on the 26th day of May, 1858, the union of the two denominations was formally consummated, with proper ceremony, under the name of the United Presbyterian Church of North America. The Synods of the respective bodies were continued for certain purposes, including the management of their boards, institutions and corporate rights; and the Associate Synod, including the moderator, adjourned to meet at Xenia, Ohio, in May, 1859, and met accordingly, and again adjourned.

On the day after the union was formally consummated, Rev. Samuel Hindman, who had become minister to the congregation of Pleasant Divide, and eight others, protested against the act of union. These protestors called, what they termed, a synod of the Associate Church, to meet in Canonsburg, Pa., in October, 1858. They met accordingly, and styled themselves the *True* Associate Synod of North America, and claimed that the Associate Synod, which met in May, by their act of union, became dissolved. At this meeting they claimed to change the Presbyteries, reducing their number from twenty to three, and so changing the boundaries of the Iowa Presbytery as to include the State of Illinois within it. The congregation of Pleasant Divide had within it, at the time the union was consummated, about one hundred church members or communicants, less than twenty of whom adhered to the union; the others, between eighty and ninety, with their minister, Rev.

McBride v. Porter.

Samuel Hindman, refused to go into the union, and adhered to the protestors and their organization. The plaintiffs were duly elected trustees for the congregation of Pleasant Divide by those who adhered to the union, and the defendants were likewise elected by those who refused to go into the union, and each set of trustees claim the meeting house and the two acres of land. The defendants being in possession, the plaintiffs brought this suit in equity to. quiet their title and recover possession. The court below dismissed the petition absolutely, and plaintiffs appeal.

*T. B. Perry* for appellants.

*C. C. Nourse* for appellees.

COLE, J.— I. Under our form of government, there is a complete severance of the church from the State; and in this State we have constitutional provisions inhibiting the legislature and the courts from interfering with the rights of parties on account of their opinions on the subject of religion. The only questions with which we have to deal in this case, then, are as to the legal rights of the respective parties under the facts. agreed and proved. The defendants represent a large majority of the communicants and congregation of Pleasant Divide, and the republican principle, which obtains in the civil government of this country, that the whole are bound by the acts of the majority, when those acts are not in conflict with the articles of the Constitution, obtains with equal force and uniformity, in relation to the government of corporations and voluntary associations of individuals. Where property is held by such voluntary associations or corporations, absolutely and without any limitation, a majority may dispose of, retain, or occupy and manage it as they please, admitting the minority to the same bene-

1 CORPORA-
TION:
power of.

fits as themselves. And if the deed in this case conveyed the property to the trustees of the congregation of Pleasant Divide for the use of the congregation simply, without further specification as to the use or trust intended, there can be no question as to the right of the majority of the congregation, as shown in this case, to control it in the manner they might choose. Angell and Ames on Corp., § 499; 2 Kent's Com., 293; *St. Mary's Church in Philadelphia*, 7th Serg. and Rawle, 517; *Keyser and another* v. *Stansifer et al.*, 6 Ohio, 363.

II. The deed of conveyance of the property in controversy, is to certain persons "as trustees of the Associate Congregation of Pleasant Divide, as subordinate to the Associate Presbytery of Iowa, subordinate to the Associate Synod of North America." The grantees took the title, therefore, subject to this limitation, and it is not in the rightful power of the minority, or of the majority, or even of the whole congregation, to divert the property from the use and trust for and with which it was thus conveyed. The parties receiving the title took the same subject to the trust, and it is peculiarly within the province of a court of equity to enforce the trust, and in its enforcement the court will look to the trust specified and intended, and must disregard all questions as to majorities, or as to religious creeds and beliefs, except so far as shall be necessary to ascertain the trust intended, and the application of the property accordingly.

The real question in controversy is one of fact, and that is, which of the two parties, plaintiffs or defendants, are the trustees of the Congregation of Pleasant Divide as subordinate to the Associate Presbytery of Iowa, subordinate to the Associate Synod of North America. It is clear that the parties thus in subordination to the presbytery and synod, are entitled to the property; for it is to them, and to their use that the property is conveyed.

This question of fact, like most other litigated questions, is involed in some doubt. In the first place, there is not a little conflict of testimony; and secondly, after this conflict is reconciled as far as practicable, there still remains, upon the proved and conceded facts of the case, some doubt as to the ultimate fact to be determined. The plaintiffs claim for themselves and beneficiaries, that they are in true subordination to the presbytery and synod, as described in the deed; for that their presbytery and synod are composed of the same persons, and together constitute nearly nineteen-twentieths of all their original number, and have continued by regular adjournments to hold their meetings and maintain their organization. The defendants claim that the plaintiffs are not thus in true subordination; for that they have, to a greater or less extent, changed their creed, have abandoned their name, changed their church courts, and have united with a body of professing Christians, formerly in hostility to them. On the other hand, the defendants claim for themselves and beneficiaries, that they are in true subordination to the presbytery and synod described in the deed; for that their presbytery and synod are composed of former members of those bodies and none others, and they adhere to the same name and creed, and maintain the same church courts. While the plaintiffs insist that the defendants and their adherents have left the original and true presbytery and synod, by seceding from the main and regular bodies, and have organized a new presbytery and synod, in opposition and in insubordination to the true and legitimate bodies, and have constituted entirely new presbyteries, and so changed the Iowa Presbytery as to include the State of Illinois, which was another distinct presbytery, retaining the name of Iowa Presbytery, and that they have only adopted the name, without the membership or organization of the true presbytery and synod. These

*3. —— Application of rule.*

respective claims and answers thereto, are but additional instances illustrative of the fact that very much of real error may be embodied in, and clothed with the garb of seeming truth. We have come to the conclusion that the weight of testimony establishes the fact that the plaintiffs, and those whom they represent, are in true subordination to the Associate Presbytery of Iowa, subordinate to the Associate Synod of North America, and as such are entitled to the property in controversy, and to the use and control thereof; and while we recognize the correctness and force of much of the reasoning in behalf of defendants, we proceed to state some of the reasons which have led us to this conclusion.

*First:* The subject of union between the Associate and Associate Reformed churches had been agitated, contemplated and discussed by the members, sessions, presbyteries and synods of the respective churches, for a period of more than fifteen years; the subject having engaged no small share of the attention of associate synods since 1841, when a committee on the subject was first appointed by the synod. In 1856, by the action of the Associate Synod, the basis of union was sent down in overture to the presbyteries and sessions to report thereon, at the next meeting of the synod. In 1857, the Presbytery of Iowa, through which the sessions, within its jurisdiction, made their returns or reports to the synod, reported unanimously in favor of the adoption of the basis of union, without proposing any amendment. From these and other facts, we conclude that the congregation of Pleasant Divide had ample time and opportunity to consider of the question of forming the union, and that with full knowledge of the question, the session of that congregation, as the regularly constituted representative of it, agreed to the union in advance of its consummation. This conclusion is fortified by the fact that, during the whole controversy, it has been nowhere

asserted or intimated that this congregation did not in advance assent to the union. It is true that, at the time of the agreement of the congregation to the union, Rev. Samuel Hindman, who afterwards became such, was not then their pastor. And it is possible that the views of duty on that subject, subsequently entertained by their pastor, had a great influence upon the views of members of that congregation, as to the wisdom of their previous action and the consequent division upon that subject. However this may be, it is certainly no occasion for reproach to those who may have adopted his views of duty, to say that they listened confidingly to, and finally adopted and followed, in a matter of temporal church organization, the views and opinions of duty, of him, their pastor, to whose instructions and teachings they gave implicit credence, as to the course of conduct and faith necessary to secure their final welfare.

*Second:* The Presbytery of Iowa, in subordination to which the congregation of Pleasant Divide was to continue, as a condition upon which it could retain the title to the property, by a unanimous vote declared in favor of the union upon the basis proposed.

*Third:* The Associate Synod of North America, in like subordination to which the congregation was to continue, in order to retain the property, by a vote of 104 to 13, declared in favor of the union, and adopted the basis, the declaration, argument and illustration. A like unanimity of so large a deliberative body, assembled from all portions of the Union, has seldom, if ever, been before witnessed.

*Fourth:* The synod had the power, according to the constitution and form of government of the Associate church, to form the union. The rightful power to form the union was not questioned, so far as appears, by any person, either in the sessions, presbyteries or synods, during the fifteen years the subject was under discussion. Nor

did the nine protestors question, in their written protest, the rightful power to form the union in the manner it was formed. They placed their protest on the grounds that the testimony on which the union was formed as a basis, was not satisfactory to their minds; that it was not framed with sufficient reference to the past history and present condition of the visible church; that it was but little more than a reiteration of the doctrines of the Westminster Confession of Faith; that while in some particulars it was more clear and explicit than the old testimony, and recognized public social covenanting as a moral duty, yet it made no provision for the observance of that ordinance, by preparing a covenant bond, nor by reference to that bond in the old testimony; and they conclude their protest by saying, "after all, we are free to declare, that some of us at least, hoping for the best, might have been induced to go into the union on this basis, if we could see that the adoption of it by the Associate Reformed Church, is, or ought to be, considered clear, unqualified and satisfactory." The power to form the union was therefore adjudicated by the highest church judicatory, and was exercised without objection or question as to the power; this ought to be conclusive upon the church courts, the church members, and it being a question of ecclesiastical rather than legal power, it might well be regarded as conclusive upon this court. But, upon principle as well as by concession, the synod possessed the power. If it is regarded as a representative body, and governed by the republican principle that a majority must rule, its acception must be sustained; or, if the more fundamental principle is appealed to, that the people who are to be affected by a law, is the primary source from whence comes the power to enact that law, we find a practical and literal adherence to that principle in the action of synod, by which the question was first referred or overtured to the several churches, and by

them acted upon as instructions to the synod. The synod then had the power, for it had derived it from the primary source of all governmental power—the people.

*Fifth.* The conveyance is to the congregation of Pleasant Divide as subordinate to the Associate Presbytery, &c.; it is not to that congregation so long as it shall entertain, or continue subordinate to, the faith and doctrine then entertained by the Associate Church. It is to the congregation as subordinate to that church, and, therefore, if that church, through its properly constituted judicatories, change its creed, as it is claimed by the defendants was done by the union, such change does not sever or absolve from the subordination in which the congregation was to continue. Churches, like individuals, would be unfaithful alike to themselves, to posterity and to God, if they failed in progress and improvement. To change their creed would not, of itself, necessarily be either progression or improvement; but progress and improvement, or, what the Christian terms, attainments, are often evidenced by a corresponding change of creed. Whether there was a change of creed, of faith and doctrine, at the time of the union, and as a means thereto, it is not necessary for us to decide; for whether there was or not, cannot affect the rights of the parties in this case. It is probable there was a change of creed upon some one or more points, upon which these two churches had been at variance; and this very change whereby a union was obtained between these two churches, which entertained the same views in relation to the essentials of Christianity, as well as to the form of church government, is at least some evidence of progress and improvement; for thereby they are brought to a common brotherhood, and a joint effort against the foe of mankind; and the time and talent before devoted to their divisions, may be now devoted to the service of their common Master.

Nor is a change of creed a new feature in the history of the Associate Church.

The church had its origin in the secession of Erskine and others, in 1733, when they adopted their first act and testimony declaring their adherence to the old standards, and bearing testimony against the errors of the church of Scotland. In 1737, they adopted a new one. In 1741, they adopted a testimony against a general fast kept by the church of Scotland, because it had been appointed by the civil authority. In 1742, they bore testimony against the great revival in which Whitfield participated, as a delusion of Satan, and appointed a solemn fast on account of it. In 1744, they declared the act of renewing covenants to be a term of communion, and very soon thereafter discontinued it. In 1746, they divided on the subject of taking the burgess oath. In 1753, they adopted a new narrative act and testimony. In 1766, they approved of their missionaries in America joining the anti-burgher presbytery there. In 1782, they approved of joining in the union that constituted the Associate Reformed Church in America; and other changes were adopted in 1784, 1788, 1805, 1811, &c. And besides these, there have been various unions formed with other churches, all showing abundantly that the Associate Church is one of change and of progress.

*Sixth:* At the time the union was formed, and as a part of the general arrangement, it was "Resolved, that the different boards and institutions of the respective churches shall not be affected by this union, but shall have control of their funds and retain all their corporate or other rights and privileges until the interest of the church shall require a change." And each of the synods retained and continued their separate organizations, and met annually thereafter, upon their own adjournments, as they had done during their existence, and prior to the union. The business transacted at these subsequent meetings pertained only to those

matters necessary to close the unfinished business of the respective synods, on hand at the time of forming the union. This resolution, and the retention of the separate organization of the respective synods, are, however, only incidental, and are entitled to but little consideration, so far as forming a basis upon which to rest the plaintiffs' claim, while they have quite an important bearing adverse to the defendant's claim as to the legitimacy of the synod claimed to have been organized by the protestors as the true Associate Synod; since, while the original synod continued to maintain its organization, and retain its vitality as such, it was not competent to organize another synod as its successor. *Nemo est hæres viventis.* Nor do we regard the fact that by the union, the Associate Church lost its name and adopted that of United Presbyterian Church, as at all controlling. It is the *substance*, and not the *name*, that the law regards. The identity of the Associate Church is just as perfect and complete under the new name as it would be had it retained the old. The fact that a large number of professing Christians had all at once discovered that the creed of the Associate Church was acceptable to them, and therefore united with it, could not destroy its identity. Or, if the members of the church should find that a large body of Christians entertained the same faith and doctrine with them, and they should mutually agree to unite in their church organization, such union could not destroy its identity any more than if the same number had been regularly admitted to membership in the ordinary way. In whatever way the growth, increase and development of the church is attained, its identity equally remains. By their mutual growth and attainments, the Associate Church and Associate Reformed Church have found themselves embracing the same truths; and being one in faith and practice, they manifest that oneness by a union in their worship. Such union does not destroy the identity of either, any more

than the identity of one would have been destroyed if it had admitted the individuals of the other to membership in the ordinary way. The identity of a social organization, or of a race of people, is not destroyed by such additions or unions, for their continuity is identity.

*Seventh:* We find the members of the Associate Presbytery of Iowa, and of the Synod of North America, under the same form of church government, and entertaining the same faith and doctrine, with the congregation of Pleasant Divide, as represented by the plaintiffs in subordination thereto; and although the membership of that presbytery and synod may be enlarged and the name changed, yet the identity of the church and subordination of the congregation continue, and these entitle the plaintiffs to a decree for the property.

A judgment accordingly will be entered in this court, and the judgment of the District Court

Reversed.