**Fred MERTZ et al. (Plaintiffs), Respondents,**

v.

**Elmer SCHAEFFER et al. (Defendants), Appellants.**

No. 28915.

St. Louis Court of Appeals.

Missouri.

Sept. 21, 1954.

Rehearing Denied Oct. 15, 1954.

Jerome F. Duggan, Edw. C. Koeneman, Sidney W. Horwitz and Dubinsky & Duggan, St. Louis, for appellants.

George Eigel, L. A. Robertson and John A. Eigel, St. Louis, for respondents.

WOLFE, Commissioner.

This is a suit to enjoin the defendants from interfering with the plaintiffs' use and control of the property of the Trinity Lutheran Church. The trial resulted in a decree for the plaintiffs which directed the defendants to turn over to the plaintiffs all the church property. From the decree the defendants prosecute this appeal.

All parties to this suit are members of the Trinity Lutheran Church. The church is about fifty years old and has been incorporated for the past thirteen years. It had been associated at all times with the Missouri Synod. In 1950 the Missouri Synod attempted to restate certain doctrines of the Lutheran faith in what it called the Common Confession. This caused some discussion in the Trinity Lutheran Church and throughout the year 1951 there were meetings where the matter was considered. The constitution of the church corporation provided in Article VIII:

"The congregation shall decide all matters relating to the church or church affairs, and every member may appeal to it in regard to any matter relating to the affairs and the government of said church; the decision of the congregation shall be final and binding: but such decision shall always be in accord with the Word of God and the Symbolical Books of the Evangelical Lutheran Church: if it is not so, the decision shall be null and void."

It also provided in Article VI:

"Every male member of this congregation who is at least twenty-one years of age and has signed the Constitution and the By-laws of the congregation in a book kept by the secretary for this purpose, shall have the right to vote."

The by-laws provided for an annual meeting, regular monthly meetings, and special meetings at the call of the president or pastor or three members of the Church council or by five voting members. A quorum for such meeting consisted of one-fifth of the voting members of the congregation.

The first indication of the congregation's consideration of the Common Confession adopted by the Missouri Synod is found in the minutes of the regular meeting of March 12, 1951. There were eleven members present and thirty-two absent at this meeting. The minutes state: "Moved and seconded that we reject the common confession and so notified the president of Synod." In May of the same year there was noted in the minutes of the regular meeting that there was discussion "on conditions within the Synod." At this meeting only nine were present. At the regular meetings of August, September and November the matter again came up. At the November meeting there were sixteen members of the congregation present, twenty-eight absent. It was resolved that the church join the Orthodox Lutheran Conference. This organization was opposed to the Common Confession as adopted by the Missouri Synod.

On December 10, 1951, at the regular meeting, thirty-three of the members were present and ten were absent. According to the testimony of the members of the church and the minutes of the meeting there was a motion made to rejoin the Missouri Synod, but it was declared out of order by the pastor and the meeting adjourned before any action was taken upon it. Some of the members after the meeting of December 10 consulted Pastor Olson, who was connected with the Missouri Synod. After that a special meeting was called by the required number of members of the church. It was set for December 20, and notices were mailed on December 18. When the members gathered at the church for the meeting they found the church building locked and could not gain entrance, so the meeting was held in an open pavilion on the church grounds. Twenty-four members were present and nineteen were absent. The minutes show the following action taken:

"Mr. Harvey Hendricks moved that 'We rescind all resolutions that severed Trinity Congregation from the Missouri Synod and affiliated Trinity Congregation with the Orthodox Lutheran Conference, and that we sever all connections with the Orthodox Lutheran Conference and that we affiliate again with the Lutheran Church Missouri Synod.' The motion was seconded by Malcom Ricker. The chairman called for the vote to be shown by a raising of hands and the motion was passed unanimously."

On December 23, which was the Sunday following the meeting in the church pavilion, the pastor, named G. G. Schupmann, announced that all of those who had attended the meeting on the 20th were no longer members of the church. The following Sunday there were about seventy persons in attendance at church and Pastor Schupmann did not appear. That afternoon six members of the church called upon him and he said he would not serve as their pastor any more but would hold services in his home. He was asked if that meant that he had resigned. He replied that he had not resigned but that he had been put out. Schupmann held services in his home on December 30 and 31, 1951, and on January 1, 6, and 13, of 1952, while the plaintiffs held services in their regular church building with the aid of professors from Concordia Seminary.

On January 14, 1952, which was the time for the regular annual meeting, the plaintiffs assembled in the basement of the church where such meetings had always been held. There were twenty-four present at this meeting. At the same time Pastor Schupmann and eleven other members met in the auditorium of the church and declined an invitation from members meeting in the basement to join them. On the day following, Pastor Olson of the Missouri Synod was notified by Pastor Schupmann that the members who were following him had taken over the church property and the Missouri Synod would have to sue them out. He also told Pastor Olson that he would have him arrested if he came to the church to preach. The Missouri Synod has no interest in the church property and serves churches only in an advisory capacity.

On January 24, 1952, plaintiffs, who sought to remain with the Missouri Synod, brought this action to enjoin the defendants from interfering with their use of the church property. The court, in an effort to allow the members of the church to compromise their differences, permitted both factions to use the church for stated periods by a temporary order. This did not have the desired result and the pastor locked out the plaintiffs and called them trespassers. On July 13, 1953, plaintiffs held their regular meeting with well over half of the voting members present and again resolved to stay in the Missouri Synod.

There was other evidence, which dealt with the distinction between the "Common Confession" promulgated by the Missouri Synod and the orthodox version of the same matters advocated by the Orthodox Lutheran Conference. This will be more fully discussed with the points to which it is related. It was upon the foregoing evidence that the court found that there had been no valid meeting of the congregation passing upon the question of its affiliation with one group or the other until the meeting of July 13, 1953, when the members again voted to remain with the Missouri Synod. This was followed by the decree that all of the property of the church be turned over to the plaintiffs.

The underlying basis of most of the points raised by the appellants goes to the question of whether or not the plaintiffs are members of the church, it being contended that they have departed from the doctrinal teaching which the church professed.

It is true that a part of the members of a church, incorporated as a certain denomination, may not impose upon the church beliefs of a new sect even though those who seek adherence to the new beliefs may be in the majority. Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805; Klix v. Polish Roman Catholic St. Stanislaus Parish, 137

Mo.App. 347, 118 S.W. 1171, 1176. These two cases deal exhaustively with the subject, and in the one last cited Judge Goode, speaking for this court, quoted with approval from the South Carolina case of Harmon v. Dreher, 1 Speers, Eq. 87, as follows:

> "But if the incorporation of the church as a Lutheran Church imports what has been stated in evidence, it would be a breach of all liberty, as well as of faith, that the majority should impose a new contract upon the minority. Suppose a majority should next year spring up in favor of the Roman Catholic or Mohammedan religion, and introduce auricular confession and indulgences, or the Koran, into this congregation, would not these defendants, however small a minority they might form, see and feel that their liberties were trampled on, by so gross a violation of the contract of association contained in their charter?"

The case in which the above quotation appears arose out of an attempted union of the German Lutheran and the German Presbyterian churches in South Carolina. This was a radical departure from the beliefs held by the orthodox Lutherans.

▆ Where, as in the Trinity Lutheran Church, the congregation is vested with the power to decide all church affairs, and there is no ecclesiastical hierarchy or court with power to determine disputes, the will of the majority must evidence a real and definite departure from the basic faith of the church before the minority can successfully maintain that the majority has departed from its doctrine. Rock Dell Norwegian Evangelical Lutheran Congregation v. Mommsen, 174 Minn. 207, 219 N.W. 88; Mt. Zion Baptist Church v. Whitmore, 83 Iowa 138, 49 N.W. 81, 13 L.R.A. 198; Davis v. Ross, 255 Ala. 668, 53 So.2d 544.

The courts are concerned only with the property rights of the litigants. However, we are confronted with a dispute over property, which can only be determined by deciding whether or not a part of the congregation has left the faith. There is no ecclesiastical body with authority to pronounce and enforce acceptance of its interpretation of the doctrines in question, for the Synod only offers advice on spiritual matters and exercises no secular control. Therefore, we have no ecclesiastical decision to which we can defer and we must of necessity examine the alleged conflicts of belief in order to determine whether or not the majority of the congregation has departed from the faith. Russie v. Brazzell, 128 Mo. 93, 30 S.W. 526; Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805; Briscoe v. Williams, Mo.App., 192 S.W.2d 643; Olear v. Haniak, 235 Mo.App. 249, 131 S.W.2d 375.

The defendants offered as an exhibit a printed statement of the "Common Confession" and the orthodox Lutheran doctrine. To set it out in full would unduly lengthen this opinion and serve no useful purpose but two of the alleged differences are as follows:

The "Common Confession" on the question of "Inspiration" states:

> "Since the Holy Spirit by devine inspiration supplied to the holy writers content and fitting word, therefore we acknowledge the Holy Scriptures in their entirety as the inspired Word of God."

> "Through the Holy Scriptures, which God caused to be written by men chosen and inspired by Him, God instructs and assures us regarding His will for us."

The Orthodox Lutheran Doctrine on the same subject is as follows:

> " 'By inspiration of God' means that God the Holy Ghost moved the holy men to write, and put into their minds, the very thoughts which they expressed and the very words which they wrote. (Cathechism Qu. 10)

> "The Holy Scriptures are in all their parts and words the infallible truth, also in those parts which treat of historical, geographical, and other secular matters. John 10, 35."

If either of these mean anything more or less than an acceptance of the scriptures as the Word of God, it is not obvious to the layman nor could the theologian make a logical distinction.

The same could be said of "Church Fellowship". The "Common Confession" treats this as follows:

"We dare not condone error or have alter and pulpit fellowship and un-Scriptural cooperation with erring individuals, church bodies, or church groups that refuse to be corrected by God's Word."

On the same subject the Orthodox Lutheran Doctrine states:

"We repudiate unionism, that is, church-fellowship with the adherents of false doctrine, as disobedience to God's command, as causing divisions in the Church. Romans 16, 17."

There are in all seven matters treated upon in the exhibit quoted above and the variation between the two statements of the Lutheran faith is as fine in all of them as it is in the quoted sections. This and the other testimony and evidence relating to an alleged departure from the faith discloses nothing more than shades of opinion on the same doctrine or dogma. The communicants of the church could obviously adhere to either without departure from the faith upon which the church was founded. It is therefore evident that the majority of the members by their vote to remain in the Missouri Synod did not leave the church or by their action seek to impose a change of doctrine upon it.

It is contended that the trial court erred in holding that the meeting of November 12, 1951, where a resolution withdrawing from the Missouri Synod was passed, was invalid. The validity of this meeting was not in issue. It is of no importance to the determination of this case, for as soon as practical thereafter the special meeting was held rescinding the action of the prior meeting. The meeting of December 20 was called in accordance with the constitution and by-laws of the church. The plaintiffs who attended it constituted the majority of the members of the church and they duly moved and unanimously passed the motion to rejoin the Missouri Synod. It was after this that the pastor declined to preach in the church and declared that the majority were dissenters. If there were any dissenters, it was the pastor and his small group, and not the plaintiffs, who kept the church within the Synod with which it had long been affiliated.

Although the court erroneously passed upon extraneous matters when it decreed that there had been no valid meeting until July 13, 1953, this in no way affects the results sought and obtained, for the property was decreed as belonging to the plaintiffs. The court therefore properly passed upon the only issue before it when it placed the property in the hands of those parties entitled to its management and control.

Respondents filed a motion to dismiss the appeal on the ground that the appellants' brief failed to comply with Rule 1.08 of the Missouri Supreme Court, 42 V.A.M.S. The motion was submitted with the case and appears to be without merit.

For all the above reasons, it is the recommendation of the Commissioner that the motion to dismiss the appeal be overruled and that the decree of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.

The motion to dismiss the appeal is accordingly overruled and the decree of the circuit court affirmed.

RUDDY and BENNICK, JJ., and HOLMAN, Special Judge, concur.