Woodrow MONTGOMERY, a Trustee and Deacon of the First Freewill Baptist Church of Lebanon, Missouri, William Owens, a Trustee of said Church, Homer Mosier, a Deacon of said Church, Charlie Taylor, a Deacon of said Church, Gladys Montgomery, Clerk of said Church, Farris Garrett, Treasurer of said Church, Finis D. Johnson, Pastor and Moderator of said Church, Plaintiffs-Appellants,

v.

N. E. SNYDER, Bill Williams, Wayne McAllister, Walter Claxton, B. E. Caudle and Dorothy Lemery, Defendants-Respondents.

No. 7684.

Springfield Court of Appeals.

Missouri.

Oct. 20, 1958.

Donnelly & Donnelly, Lebanon, Claude T. Wood, Richland, for appellants.

Fields & Low, John F. Low, Lebanon, Edgar Mayfield, St. Louis, for respondents.

McDOWELL, Judge.

This suit originated by plaintiffs filing a petition in the Circuit Court of Laclede County, Missouri, as representatives of the majority of the membership of the First Freewill Baptist Church, of Lebanon, against defendants, constituting a minority membership of such church, to enjoin defendants from interfering with church property. The trial resulted in a judgment dissolving a temporary injunction granted plaintiffs and the dismissal of plaintiffs' petition and in awarding a perpetual injunction on defendants' counterclaim.

The petition, in substance, alleged that plaintiffs are the representatives and duly constituted officers of the First Freewill Baptist Church and of the majority of such membership and, as such representatives, have the right, title and interest in and to the real estate and church property.

That said church, at the time of its organization, and, at all times hereinafter mentioned, was an independent body, so far as it relates to its own government, the transaction of its business, choice of its officers and discipline of its members; that plaintiffs and those they represent have strictly adhered to the established tenets and creeds of the church at the time the property was acquired; that defendants, without consent of plaintiffs, or the church, and contrary to and in violation of the rules, by-laws and articles of government of said church and of the National Association, entered into and upon the real estate and the building thereon and appropriated to themselves the use of said building to the exclusion of plaintiffs and that defendants assert they will continue to permanently deprive plaintiffs of said premises.

Plaintiffs pray for a temporary injunction restraining defendants from interfering with the use and enjoyment, possession and exclusive control of the church building during the pendency of the action and for a perpetual injunction restraining and enjoining defendants from interfering with the use, enjoyment, possession and exclusive control of such buildings.

Defendants' answer and counterclaim denied the allegations in plaintiffs' petition and affirmatively pleaded that plaintiffs, while holding themselves out to the membership as officers and representatives of the church, have failed, neglected and refused to follow and adhere to the original doctrine, faith, beliefs, principles, practices and rules of government of said church at the time said property was acquired; that plaintiffs have conspired and acted together to establish themselves as a majority faction of the church and, as such majority, acted in complete disregard of the original practices and doctrines of the church. That defendants, since the organization of the church and acquisition of the church property, have strictly adhered to and abided by the faith, doctrines, beliefs, principles, practices and rules of the church government which the united body professed when the church was organized and property acquired; that by reason of such facts defendants are entitled to the title, custody, and use of the property belonging to said church.

The counterclaim asked that plaintiffs be permanently and perpetually enjoined from interfering with defendants' use, enjoyment and possession of the property; that defendants are members of the First Freewill Baptist Church of Lebanon organized July 26, 1947, as a prospective member of the Wright County Quarterly Meeting and the Union Association of Freewill Baptists; that on August 29, 1947, it united with the Union Association and on September 5, 1947, with the Wright County Quarterly Meeting; that it followed the doctrines, faith, beliefs, principles, practices and rules followed and professed by the Wright County Quarterly Meeting and Union Association; that prior to the controversy herein the church was in good standing in the Wright County Quarterly Meeting and Union Association and was adhering to its doctrine, faith, and practices as set forth in the Treatise of Faith and Practice of the Freewill Baptists of the Union Association; that the church property was acquired July 30, 1947, and conveyed to four trustees for the church, one of which is now plaintiff and one a defendant; that the church building was thereafter erected by the united body.

It alleged that plaintiffs have acted to overthrow and violate the doctrines, faith, beliefs, principles, practices and rules of the church government and have forfeited all rights, title and interest to said property.

The trial court found that plaintiffs' group departed from the faith, practices, usages, doctrines and rules of church government followed and adhered to by the united body at time the church property was acquired; that defendants' group had at all times strictly adhered to the faith, practices, usages, doctrines and rules of church government professed at the time the church property was acquired and by its judgment dissolved the temporary injunction awarded plaintiffs and dismissed plaintiffs' petition and permanently enjoined plaintiffs from interfering with the custody and use of the church property.

The evidence shows that on April 8, 1956, defendants seized control of the church edifice, affixed a Yale lock to the door and ousted plaintiffs from the building. This injunction suit followed and the court granted plaintiffs a temporary injunction restraining defendants from interfering with plaintiffs' use and control of the church property.

This church was organized July 25, 1947, under the name "Lebanon Freewill Baptist Church". In the same year the church property was deeded to four trustees for the benefit and use of the church and the united body erected a church building thereon.

August 20, 1947, the church voted to affiliate with Union Association of Freewill Baptists and, on September 5, 1947, to unite with the Wright County Quarterly Meeting. On October 1, 1951, by unanimous vote of the members, the name was changed to "First Freewill Baptist Church".

In the year 1947, when the church was organized and building constructed, the Treatise followed by the Wright County Quarterly Meeting was the Treatise used by the National and State Associations of Freewill Baptists, which is in evidence as defendants' exhibit No. 8. In the year 1952, the Wright County Quarterly Meeting and the Union Association formulated their own Treatise, which is defendants' exhibit No. 7.

About 1900 the Union Association was organized; the National Association was organized November 7, 1935. The Union Association was affiliated with the National Association until 1937, at which time, by permission of the National Association, it withdrew therefrom and remained separate and distinct from said Association. The Lebanon church never affiliated with the National and State organizations until it attempted to do so February 15, 1956.

The schism in the church was brought about on August 17, 1955, when the congregation, at a regular meeting, adopted twelve by-laws. By-law No. 7 seems to have caused the trouble. It provided: "Any member without providential reason who refuses to report to the Church in person within six months shall be counted not in good standing to vote or voice in the Church conference until they resume their duties to the Church".

January 27, 1956, the minority group of the congregation, consisting in part of defendants, petitioned the Wright County Quarterly Meeting claiming to have been aggrieved by the action of the majority in adopting of said ordinances and in the expulsion of Bill Williams from the church, requesting a council for advice as to the action of the majority. These petitions are in evidence as defendants' exhibits 1–A, 1–B, and 1–C. Moderator, Reverend N. E. Snyder, appointed an investigating committee to investigate the charge. The committee had a conference with Reverend F. D. Johnson, Pastor of the First Freewill Baptist Church, plaintiff Woodrow Montgomery, together with certain members of defendants' group. The committee made an oral report to the Moderator of the Wright County Quarterly Meeting to the effect that Reverend Johnson had agreed to return to the Lebanon Church and use his influence to have the by-laws repealed. The Minute book of the First Freewill Baptist Church, at page 73, shows the following: "First Freewill Baptist Church, met in regular conference Feb. 15, 1956. * * * After a motion and second it was voted to go

out of Wright County Quarterly Meeting and Union Association. After a motion and second it was voted to send a petitionary letter to Liberty Quarterly Meeting and Association. After a motion and second it voted to take up the Original Freewill Baptist treatise. After a motion and second it was voted to keep the church by-laws. After a motion and second it was voted to bring charge of public offence to the church and trying to overthrow the government of the church against Bill Williams for church trial. After a motion and second by a majority vote of the church Bill Williams was excluded from membership of the church. * * *"

F. D. Johnson advised the Wright County Quarterly Meeting of the actions taken by the church February 15th, by letter (which is in evidence as defendants' exhibit No. 4). February 17, 1956, Johnson and other representatives of plaintiffs' group met with the Executive Board of the Liberty Quarterly Meeting and Association and were, by the Board, accepted into the Liberty Quarterly Meeting and Association upon condition that a letter of dismission from the Wright County Quarterly Meeting and Union Association would be presented to such Quarterly Meeting and Association. On April 1, 1956, at regular meeting of the First Freewill Baptist Church, the following action was taken: "After motion and second it was voted to send letter to Wright County Quarterly Meeting to dismiss the First Freewill Baptist Church from Wright County Quarterly Meeting and Union Association." (This letter is in evidence as defendants' exhibit No. 5.) It states that the Lebanon church on February 15, 1956, by vote of 31 to 8, voted to go out of the Wright County Quarterly Meeting and Union Association and asked for dismission from Wright County Quarterly Meeting and Union Association. Thereafter, the Wright County Quarterly Meeting considered the charges of the minority as to the actions of the majority, and, upon discovering that the First Freewill Baptist Church was not shown

upon its records, voted to drop the charges and a letter of dismission was not granted.

April 8, 1956, these defendants, pursuant to the notice published in the Lebanon newspaper to the members interested in staying in the Union Association, broke into the church about 2:00 p. m., and organized under the name "Lebanon Freewill Baptist Church", elected a pastor, trustee, and other officials. They prepared a new church roll of the interested members in staying in the Union Association, composed of 19 members. They placed a lock on the church building and excluded plaintiffs from the use thereof. They asserted they would retain possession of the church building until surrender thereof was ordered by the court. The First Freewill Baptist Church was admitted to membership in the Cave Springs Quarterly Meeting and Cave Springs Association October 6, 1956. Said association, at that time, was, and now is, a member of the State and National Associations of Freewill Baptists, and use as their Treatise, the Treatise in evidence as defendants' exhibit No. 6.

We adopt the finding of the trial court that there are no material variations in the Treatise, in evidence as exhibit 6, and that of exhibit 8; that all of these Treatises provide: "That when the minority of a church are aggrieved with the actions of the majority the minority of the church have the right to call or request a council of the Quarterly Meeting, this council may be called simply for advice or as a board of arbitration, their decision should be final". (2) That "a Quarterly Meeting cannot deprive a church of its independent form of government, nor its right to discipline its own membership, * * *" (3) "When a church in good standing requests a dismission to unite with another Quarterly Meeting, a letter of dismission and recommendation is given. Also when a number of churches in good standing wish to be organized into a new Quarterly Meeting, they are dismissed as above, but it is contrary to the usages of the denomination for any church to dissolve its con-

nection with the Quarterly Meeting, or to disband without the approval of the Quarterly Meeting. A Quarterly Meeting should not receive a church rejected by another Quarterly Meeting, without reconciliation". (4) "If members are to be tried for misconduct, written notices of the charges and specifications of the same should be furnished to those concerned, at least one (1) week before trial."

The evidence shows that there are various differences between defendants' exhibit 6, which is the 1953 edition of the National Association's Treatise and defendants' exhibit 7, which is the Union Association's Treatise. These differences are as follows: Chapter V of the National Treatise, which deals with the Constitution and By-Laws of the National Association, at pages 59 to 71 inclusive, does not appear in the Union Treatise. Article VIII of this Chapter sets up various Boards to plan programs and supervise their operation in their respective fields. These programs include Foreign Missions, Home Missions, Education, Superannuation, Publications, Literature and Sunday School. Article IX of said Chapter provides for the establishment and operation of a Freewill Baptist College at Nashville, Tennessee.

Chapter I, Section II, page 42 of the National Treatise provides: "The church then proceeds to elect its officers, which are a clerk, a treasurer, a pastor who acts as moderator in all church meetings, and a board of deacons, who, with the pastor, clerk and treasurer, constitute a committee to promote order, activity, attendance on the means of grace, and efficient discipline of the church. * * *" Whereas, Chapter I, Section II of the Union Treatise provides: "The church then proceeds to elect its officers, which are a clerk, a treasurer, a pastor, who acts as moderator in all church meetings, and a board of deacons, also at least three (3) trustees should be elected. These have the custody of all church property subject to the will of the church, they hold office for life or during the maintenance of sound doctrine. Their

successors may be elected at any regular meeting of the church".

Chapter I, Section III, ¶ 4(e) p. 44, of the National Treatise, provides: "Questions of fellowship, expulsion, and all other items of business of the church shall be settled, by a vote of the majority present, and this action shall be final provided public announcement of the intended action is made at the last regular meeting; and the Quarterly Meeting has no power to reverse it, but may, if deemed necessary, withdraw the hand of fellowship from a church as a whole when its action is inconsistent with sound doctrine of Christian policy". Whereas, Chapter I, Section III, pp. 37–38 of the Union Treatise provides: "Questions of fellowship and expulsion are settled by vote of the majority present, provided that if only a minority of the resident membership is present, a majority of all such members at a fuller meeting may reconsider the action and re-investigate the subject. But a vote of the majority of all the resident members is *always final;* and the Quarterly Meeting has no power to reverse it, but may, if deemed necessary, withdraw the hand of fellowship from a church as a whole when its action is inconsistent with the sound doctrine or Christian policy."

Chapter II, Section II, p. 50 of the National Treatise "Ministers' Conferences" provides for such conferences to be held quarterly or annually as desired. Whereas, Chapter II, Section II, p. 44 of the Union Treatise, provides for conferences of ministers and deacons to be held annually.

Chapter I, Section VI, ¶ 4, p. 48 of the National Treatise provides: "Ministers who are subjects of discipline for unchristian conduct or for doctrine contrary to the Articles of Faith as set forth and believed by Free Will Baptists, shall be tried according to Matthew 18:15–17, providing charges are made for public or private offences, by any ordained minister, who is in good standing in his respective church and Association (or Conference) when such charges are presented in writing prop-

erly signed or by the church through its official board, in which the minister holds membership or by a church which the said minister is pastor; providing all charges are duly signed by the presenter, or prosecutor.

"(a) If the accused is dissatisfied with the decision of the Board or committee who tries his case, he shall have the privilege to appeal to the Annual Conference, or Association for consideration of the charges as preferred, and in case the higher body sustains the decision of the Committee or Council, the case is settled accordingly." Whereas, Chapter I, Section VI, ¶ 4, p. 42 of the Union Treatise, provides: "Ministers who are subjects of discipline for unChristian doctrines or practices are entitled to a council to be appointed by the Quarterly Meeting or Assoc., including at least three ministers in good standing in the denomination."

Chapter I, Section VI, ¶ 3, p. 48 of the National Treatise provides: "When a member without providential reasons, absents himself from the meetings of the church, or refuses its support for one year, it is considered a violation of the covenant and sufficient reason for dismissal." Whereas, Chapter I, Section VI, ¶ 3, p. 42 of the Union Treatise, makes the same provision except that a person refusing such support is subject to "discipline".

Defendants' exhibit 6, the National Treatise, is divided into two divisions, the first being styled "Treatise" as shown from pages 4 to 39, inclusive; the second division is designated "Practices of the Free Will Baptists, Adopted by the National Association November 7, 1935", as found at pages 41 to 84 both inclusive. The Union Association Treatise, defendants' exhibit 7, is divided into two parts, the first being "Decrees of the Faith" found on pages 3 to 34 inclusive, and the second designated "Usage of the Free Will Baptist of Union Association", found on pages 35 to 67, both inclusive.

The undisputed testimony of the witnesses for both plaintiffs and defendants is that there are no differences between the Union Treatise (defendants' exhibit 7) and the National Treatise, (defendants' exhibit 6), with respect to doctrines and creeds.

The testimony shows that there is no connection between the Union Association and State Association and that when the church severed its relations from the Union Association it did not have to have a letter of good standing from the Union Association because a group not already affiliated with the State Association would be considered as coming in from another association.

In our opinion we will refer to appellants as plaintiffs and to respondents as defendants, the position they occupied in the lower court.

█ The only issue presented by the pleadings and evidence is whether or not the trial court erred in finding that plaintiffs' group departed from the faith and doctrine followed by the united body of the church at the time the property was acquired.

In a case such as this we are not bound by the chancellor's findings, but must review the evidence de novo and reach our own conclusions as to its weight and value. However, we usually defer to the chancellor's findings when the case turns upon the credibility, weight and value of the oral testimony of witnesses who have appeared personally before him, unless we are satisfied that the findings should have been to the contrary. Pizzo v. Pizzo, 365 Mo. 1224, 295 S.W.2d 377, 385[8]; Murray v. Murray, Mo.Sup., 293 S.W.2d 436, 439[1, 2]; Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731; Henson v. Payne, Mo.App., 302 S.W.2d 44, 50[7, 8]; Bealmear v. Beeson, Mo.App., 303 S.W. 2d 690, 694[4].

This lawsuit, in substance, involves the right to the possession of church property as between two discordant groups of the church. We have no ecclesiastical decisions to which we can defer and we must of necessity examine the alleged conflicts of belief in order to determine whether or not the majority of the congregation has departed from the faith. Mertz v. Schaeffer, Mo.App., 271 S.W.2d 238, 241[2]; Russie v. Brazzell, 128 Mo. 93, 30 S.W. 526; Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805; Briscoe v. Williams, Mo.App., 192 S.W.2d 643; Olear v. Haniak, 235 Mo.App. 249, 131 S.W.2d 375.

The rule of law governing the issue in the instant case has not been uniformly stated by the courts of last resort in Missouri as well as in many other states. An exhaustive discussion of the cases in Missouri may be found in Wash.U. Quarterly, Vol. (1956), pp. 67–103, both inclusive, and in St. Louis U.Law Journal, Vol. III, (1954–1955), pp. 310–315, both inclusive.

Not all of the church problems reach the appellate courts in the same form and the treatment thereof has been varied as the problems differ. The First Freewill Baptist Church in the instant case is an independent congregation, and, under the By-laws, the church property is governed by the majority of the membership. The meeting of the First Freewill Baptist Church of Lebanon on February 15, 1956, was a regular meeting of the church according to the By-laws and rules expressed in the Union Treatise. At that meeting the majority of the members of the congregation present voted to withdraw from the Union Association and to affiliate with the National Association. This court held in Trett v. Lambeth, Mo. App., 195 S.W.2d 524, 531[4], that:

"While not assuming to pass upon purely ecclesiastical questions, this court will, however, inquire into the question of whether there was a meeting properly called and properly conducted at which purported congregational action was taken." Citing Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805 and Briscoe v. Williams, Mo.App., 192 S.W.2d 643.

However, the trial court did not base its judgment upon the question of whether or not the majority of the congregation, in voting to withdraw from the Union Association, acted in accordance with its by-laws and regulations. The only question decided by the trial court was the question of departure from the faith.

In Mertz v. Schaeffer, supra, the congregation of the Trinity Lutheran Church, an incorporated and independent religious society, became divided over a restatement of doctrines by the Missouri Synod, an organization which exercised spiritual but not secular control over the church. A minority of the congregation and the pastor contended that the restatement was in conflict with the doctrines upon which the church was founded; the majority adhered to the new teachings of the Synod and sought an injunction against the pastor and minority group to prevent interference in the use of the church. The court held that plaintiffs were entitled to the use of the property because their adherence to the new doctrine was no departure from the faith upon which the church was founded. On page 241[2], of 271 S.W.2d, the court stated the law:

"Where, as in the Trinity Lutheran Church, the congregation is vested with the power to decide all church affairs, and there is no ecclesiastical hierarchy or court with power to determine disputes, the will of the majority must evidence a real and definite departure from the basic faith of the church before the minority can successfully maintain that the majority has departed from its doctrine.
* * *

"The courts are concerned only with the property rights of the litigants. However, we are confronted with a dis-

pute over property, which can only be determined by deciding whether or not a part of the congregation has left the faith. · * * *"

In Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805, 814[2] the rule is stated: "That there must be identity of doctrine and faith before a majority of a church organization can take the church property into another church is fully recognized by McBride v. Porter, 17 Iowa 203. That, in case of a division in a church organization, that portion of the organization, whether the majority or the minority, which adheres to the existing creed, doctrines, and faith at the time of the dispute, is entitled to the church property, is unquestioned law. * * *" .

In St. Louis U.Law Journal, Vol. III, (1954–1955) p. 311, under Recent Cases, the author states: "When the church constitution or bylaws provide that the majority of the congregation shall govern, and the church is fully independent, its property will, if schism arises, be given to that faction which constitutes the majority. To permit the use and control of church property by a faction which does not conform to the regulations of the church would allow it to be diverted from the use for which the property was acquired. Again the foundation of the decision rests upon implied trust. Property may never be diverted from its intended use—use by the congregation in accordance with its rules and regulations. This is the reason why courts determine which faction conforms to the customs and usages that existed prior to dissention; and again, this is the reason for the court's refusal to permit alternate use of the church, or apportionment of church property between the conflicting factions. Those members in accord with church, regulation and custom, then, take exclusive control of the property; the opponents take nothing."

Under this statement of law the author cites Trett v. Lambeth, Mo.App., 195

S.W.2d 524. Quoting, again, from the Trett case, supra, on page 534, the court stated:

"We hold that the Land Marks were dissenters from doctrines, beliefs and practices of the Missionary Baptist Church of Center Grove, that they constituted a minority and that while they had the right and privilege to withdraw and follow any doctrine, faith and practice that they saw fit, in doing so they cannot acquire the rightful possession or control of the church property that had been given to the Center Grove Church years before and while its members believed in the doctrines, faith and practice of conventionism."

However, on page 531 of the opinion the court stated:

"As between two opposing factions of a religious association property acquired by the association before the division arose will be adjudged the property of that faction which abides by the doctrines, faith, principles and rules of church government which the united body professed when the property was acquired." Among the authorities cited to support this rule was Boyles v. Roberts, supra.

In 1944 in a Federal District Court in Missouri, Smith v. Board of Pensions of Methodist Church, Inc., D.C.E.D.Mo. 1944, 54 F.Supp. 224, Judge Hulen, in passing upon the status of the Pension Fund for retired ministers of the Methodist Episcopal Church, South, after a merger had taken place with two other Methodist groups, where the ministers of the southern church claimed property rights in the pension fund on day of merger, held for the defendant church by holding there had been no diversion of trust when ministers of other churches were included in the plan. He stated: If identity of faith were the criterion, as the Boyles case insisted, there was certainly sufficient identity here, inasmuch, as there was no doctrinal issue.

In 76 C.J.S. Religious Societies § 60, pp. 831, 832, the law is stated:

"The determination of questions relating to the control and use of church property depends largely on the form of church government which the members of the church have adopted and to which they adhere, and on constitutional and statutory provisions relative thereto. The majority of the members * * * of a religious society or corporation may, as a general rule, direct or control its property, but the acts of such majority must conform to the laws and principles of the church * * * or they are of no effect against a dissenting minority."

On page 853, § 71, this law is stated: "* * * the majority of each independent or congregational society cannot, as against a faithful minority, divert the property to another denomination or to the support of doctrines radically and fundamentally opposed to the characteristic doctrines of the society, even though the property is subject to no express trust. * * *"

From an examination of the Treatises of Faith and Practices of the Union and National Associations of Freewill Baptists, we find that so far as these Treatises relate to faith and fundamental doctrines of the church, they are exactly alike. The trial court was, therefore, justified in his findings that there were no differences between the Treatise followed by the Union Association and that followed by the National Association with respect to doctrines and creed.

In the Preface of the Original Freewill Baptist Treatise, the history of the Freewill Baptist, during its two hundred years of existence in this country, was traced. And, after the tracing of the church's history, the author states: "Among these believers it was deemed wise to set forth certain outstanding, fundamental doctrines as believed by the denomination. In several of the states there were booklets published setting forth the 'Articles of Faith'. Many of the Disciplines set forth had different ways of doing things, while the fundamental doctrine was the same in all."

The only difference between the Union Association and the National Association, as shown by the evidence, is the difference in the way of doing things. They were one and the same denomination, Freewill Baptists, and, under the Articles of Faith, believed in the same fundamental doctrines. The evidence shows that at one time the Union Association was affiliated with the National Association and that the First Freewill Baptist Church of Lebanon used the old Treatise used by the National Association. The only difference was in certain practices which the trial court set out in his judgment. We hold the trial court erred in his finding that the two branches of the Baptist Church are distinct and separate organizations and different denominations. We find they are independent, individual Freewill Baptist Churches all following the same faith and creed. It makes no difference that they may join different associations and that some of the practices are different. We agree with plaintiffs that there is no evidence to show what practices are followed by each of these Baptist Associations. There is nothing to show that the Union Association does not have Sunday School or that they do not follow the other practices as stated by the trial court in his opinion, except the testimony did show that Union Association did not support church colleges. We follow the law as declared in Mertz v. Schaeffer, supra, that the will of the majority must evidence a real and definite departure from the basic faith of the church before the minority can successfully maintain that the majority has departed from its doctrines, and, under this rule of law, the plaintiffs were entitled to the relief prayed for.

It is unnecessary to pass on plaintiffs' second contention.

Judgment reversed with instructions that the judgment rendered be set aside and judgment entered making the temporary injunction awarded plaintiffs permanent.

STONE, P. J., and RUARK, J., concur.